BARBER OIL CORPORATION (formerly known as Barber Asphalt Corporation), successor by merger to Barber Asphalt Corporation, Plaintiff,

v.

John E. MANNING, former Collector of Internal Revenue for the Fifth Collection District of New Jersey, Defendant (two cases).

Civ. A. Nos. 129–53, 12692–53.

United States District Court
D. New Jersey.

Oct. 25, 1955.

Pitney, Hardin & Ward, Newark, N. J., by Donald B. Kipp, Newark, N. J., for plaintiff. Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., by William R. Spofford, Sherwin T. McDowell, Robert R. Batt, Philadelphia, Pa., of counsel.

Raymond Del Tufo, Jr., U. S. Atty., by Herman Scott, Asst. U. S. Atty., Passaic, N. J., H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, Allen A. Bowden, Ruppert Bingham, Sp. Assts. to the Atty. Gen., for defendants.

MODARELLI, District Judge.

These actions are claims for refunds of corporate taxes. In an order by this court dated May 18, 1954, Barber Oil Corporation, etc. v. Manning, etc., Civil 129–53, was consolidated for trial with Barber Oil Corporation, etc. v. Manning, etc., Civil 692–53; it was also ordered that the initial determinations by this court would be 'on two questions of law: (1) Whether plaintiff's unadjusted basis for 'the property interests in Venezuela sold' by it on July 11, 1946, is the fair market value of the property exchanged for such interests on July 12, 1923, (reduced by the cash received by plaintiff in the July 12, 1923 transaction); and (2) the issue relating to plaintiff's basis for depreciation on the vessel SS Caribbean. The parties have filed a stipulation of facts and a supplement thereto. There has been oral argument and briefs have been submitted.

Plaintiff is a Delaware corporation, with its principal place of business in New York City. Plaintiff was the surviving corporation from the merger on April 30, 1947, of Barber Asphalt Corporation, a New Jersey corporation, into its wholly owned subsidiary, Brighton Corporation, a Delaware corporation.

On or about May 5, 1944, plaintiff as common parent corporation of an affiliated group of corporations, timely filed with defendant Manning its consolidated corporation income tax return for the taxable year 1943. Plaintiff paid $683,460.54, the amount of tax shown to be due on its return. Pursuant to a deficiency assessment, plaintiff made additional payments for the taxable year 1943 in the amount of $116,506.34, plus $25,316.99 interest. Of the principal amount paid, $197,697.05 was refunded to plaintiff by the United States Maritime Commission on July 22, 1949, pursuant to the provisions of the Merchant Ship Sales Act of 1946, 50 U.S.C.A.Appendix § 1742, relating to .the adjustment of price on the sale of merchant ships by the Maritime Commission to

United States citizens and requiring certain tax adjustments.'

On or about May 11, 1945, plaintiff timely filed with defendant Manning its consolidated corporation income tax return for the taxable year 1944. Pursuant to that return plaintiff paid $929,-541.72, plus $22.25 interest; $92,892.23 was refunded to plaintiff by the United States Maritime Commission on July 22, 1949, for the above-mentioned reason; also $7,094.66 was credited by the Commissioner in 1948 against plaintiff's liability for taxes of other years.

On or about May 8, 1947, plaintiff timely filed with defendant Manning its consolidated corporation income tax return for the taxable year 1946 and paid a tax of $6,398,482.82. On July 22, 1949, plaintiff paid to the Maritime Commission additional income tax for the taxable year 1946 in the amount of $135,310.-36 pursuant to the provisions of the Merchant Ship Sales Act; that payment and the above-mentioned payments by the Maritime Commission to the plaintiff were effected by credits and debits against balances due from and to plaintiff by the Commission on the purchase price of a certain vessel purchased by plaintiff from the Commission. Plaintiff paid to defendant Lambert additional income tax for the taxable year 1946 in the amount of $28,551.45, with interest in the amount of $9,782.59 pursuant to a deficiency assessment dated February 11, 1953.

Plaintiff filed with defendants timely and sufficient claims for refunds of corporation income tax for the years 1943, 1944, and 1946. The Commissioner of Internal Revenue disallowed in full certain of those claims. Thereafter plaintiff commenced these actions.[1]

(1) The Venezuelan Oil Royalty Issue

A. Facts

In 1912, the Government of the United States of Venezuela granted to plaintiff (then known as General Asphalt Company) acting through its Venezuelan at-

---

I. Civil Action No. 692–53 also includes claims for refunds on which the Commissioner has not acted.

torney, one, Valladares, the right to explore for and exploit all petroleum discovered in twelve named states in Venezuela and in the Delta of the Orinoco River. This right was known as the Valladares Concession.

In 1912, Valladares at the direction of plaintiff assigned the concession to The Caribbean Petroleum Company, a wholly owned subsidiary of plaintiff. The authorized capital stock of Caribbean was $1,000,000 divided into 10,000 shares of $100 each. At the time of the assignment, there were 7,500 shares of Caribbean issued and oustanding, all of which belonged to plaintiff. At or about the same time, plaintiff obtained an option to acquire a 75% interest in the Vigas Concession covering the right to explore for and exploit all petroleum discovered in certain other areas in Venezuela.

On January 17, 1913, plaintiff contracted with The Anglo-Saxon Petroleum Company, Ltd. The contract provided, in part, that Anglo-Saxon was to form a company named The Burlington Investment Company, Ltd., which was to have a capital of 1,000,000 pounds divided into 500,000 Preference Shares of one pound each and 500,000 Ordinary Shares of one pound each. Burlington was to purchase from plaintiff all of the 7,500 outstanding shares of Caribbean and plaintiff was to transfer to Burlington its Vigas option. The consideration to the plaintiff was French francs equivalent to $750,000; reimbursement of plaintiff's expenses in connection with the Valladares Concession and the Vigas Concession from July 31, 1912, to the date of delivery to Burlington of the Caribbean stock; 500,000 pounds to be satisfied by the allotment to plaintiff or its nominees of all the Ordinary Shares of Burlington credited as fully paid. Further, plaintiff was to provide Caribbean with sufficient cash to enable Caribbean to discharge its debt existing at the time of the transfer of its shares to Burlington. Any cash in excess of the amount required for this purpose was to be repaid to plaintiff. Finally, in consideration for turning over 250,000 Ordinary

Shares of Burlington stock to Anglo-Saxon plaintiff was to receive (and later did receive) the sole right of exploiting asphalt within the limits of the Valladares Concession. Caribbean was to agree (and later did agree) not to sell knowingly any of its crude oil or products for street or road making purposes except to the plaintiff.

Burlington subsequently formed Colon Development Company, Ltd., to exercise plaintiff's Vigas option; upon exercising the option Colon issued 75% of its stock to Burlington.

From 1913 to 1923, Anglo-Saxon, Burlington, and plaintiff each made certain loans to Caribbean. These loans were subsequently, but prior to 1923, converted into capital stock of Caribbean. As a result by 1923 plaintiff, Anglo-Saxon, and Burlington were all shareholders of Caribbean. Plaintiff also held minority interests in other companies organized by Anglo-Saxon.

On July 12, 1923, plaintiff (and its wholly owned subsidiary, The Barber Asphalt Company) held the following interests in Burlington, Caribbean, and other companies organized by Anglo-Saxon: 248,255 Ordinary Shares of stock of Burlington; $4,604,177.92 par value of stock of Caribbean; $6,250 par value of stock of Petroleum Utensils Company; and a fractional beneficial interest in the stock of V.O.C. Holding Company, Ltd.

On July 12, 1923, plaintiff contracted with Anglo-Saxon and others:

1. Plaintiff was to transfer to Anglo-Saxon all of the above-mentioned shares of stock of Burlington, Caribbean, Petroleum, and V.O.C., which were then owned by it, and Anglo-Saxon was to pay plaintiff $1,482,550.

2. Caribbean and Venezuelan Investment Company (Investment was formed to take over the Guzman Concession) agreed to deliver to plaintiff 12½% of the crude oil produced during the lives of the Valladares and Guzman Concessions or any substituted or additional concessions granted or thereafter to be

granted comprising lands which were at any time included in the original concessions.

3. Anglo-Saxon, agreed to use such rights as it possessed and such influence as it could exercise to procure Colon to deliver to plaintiff a royalty of 9⅝% of the crude oil produced from the Vigas properties during the life of that concession, with like provision as to substituted concessions and re-acquired areas.

4. Caribbean and Investment granted plaintiff all the rights possessed by them of exploiting and marketing any deposits of solid material asphalt then or thereafter discovered within the limits of the Valladares or Guzman Concessions.

5. Anglo-Saxon agreed that its Group would not engage in the exploitation of solid natural asphalt in Venezuela and plaintiff agreed that if it should at any time acquire any new petroleum property or concession in Venezuela it would offer it to Anglo-Saxon on a 12½% royalty basis. Subject as aforesaid, there was to be no restriction upon either party with respect to the exploitation of crude petroleum or any of its products, including asphalt in Venezuela or elsewhere.

The above-described contract dated July 12, 1923, was later modified and supplemented by three contracts, one dated December 15, 1939, and two dated December 23, 1941. The principal purpose of the contracts was to provide an incentive to Anglo-Saxon and associated companies to exploit areas which were once within the Valladares Concession but which had been released, by providing for a reduced oil royalty from these areas and by permitting certain areas to be pooled for more economical operations with certain other concessions owned by third parties. The oil royalty of 12½% payable to plaintiff under the 1923 contract was reduced as to certain areas to 6%, 4%, 3%, or 2%, depending on the area from which the oil was produced. Plaintiff was required to contri-

bute to the cost of acquiring such areas in proportion to the percentage of oil it would receive from the particular area acquired.

By assignment dated December 2, 1936, The Barber Asphalt Company assigned to General Asphalt Company (its sole stockholder) all of its right, title, and interest in the 1923 contract.

On July 11, 1946, plaintiff contracted with The Shell Petroleum Company, Ltd., whereby plaintiff sold to Shell all its rights and interests under the contract of July 12, 1923, and supplemental agreements for $25,000,000 cash.

On July 15, 1946, plaintiff applied for a closing agreement [2] to the effect that any taxable profit or income realized by plaintiff under its 1946 sale to Shell would be taxable as a long-term capital gain. [3] On August 30, 1946, such a closing agreement was entered into between plaintiff and the Secretary of the Treasury. The closing agreement, however, did not include the basis of the rights and interests sold by plaintiff to Shell. Plaintiff included in gross income in its consolidated corporation income tax return for the taxable year 1946 as a long-term capital gain the entire proceeds of the Shell sale less expenses of the sale. After assembling certain data, plaintiff filed its claim for refund. These actions were commenced when the plaintiff was unsuccessful in its claim.

### B. Law

#### The Forstmann Case

Plaintiff forcefully argues that Forstmann v. Rogers, 3 Cir., 1942, 128 F.2d 126, indistinguishably controls this case. In that case, the taxpayer in the year 1922 exchanged corporation debenture bonds for state and municipal bonds which she held for investment and not primarily for sale. The original cost allocated to the debentures was over $151,000; their fair market value in 1922 was over $711,000. In 1929 and 1930, upon the maturity of the bonds the

2. Section 3760 of the 1939 Internal Revenue Code, 26 U.S.C.A. § 3760.

3. Section 117 of the Internal Revenue Code.

taxpayer received $690,000. The general issue was whether the basis for the taxpayer's 1929–1930 gain or loss was the 1922 fair market value of the property given up in 1922 (the year in which the exchange occurred), or whether the basis was the original cost of that property. The court held that "cost" was the basis and it stated that the issue was whether the cost of the bonds within the meaning of § 113(a) of the Revenue Act of 1928 [4] was (1) the fair market value, at the time of the exchange, of the debentures given in exchange for the bonds; or (2) original cost to the taxpayer of those debentures. Relying principally on Hazeltine Corp. v. Commissioner, 3 Cir., 1937, 89 F.2d 513, the court held (1).

In the Forstmann case, the court considered whether any of the twelve exceptions to the cost basis rule set forth in § 113(a) applied. The court decided that only § 113(a)(6) [5] was pertinent but it did not apply because " * * * According to this exception the basis of property received upon an exchange is to be the cost of the property given in exchange rather than its own cost only if paragraph (b), (c), (d) or (e) of section 112, 26 U.S.C.A. Int.Rev.Acts, pages 377–379, describes the exchange. * * *" [128 F.2d 128.] The court then decided that only subparagraph (1) of paragraph (b) [6] could possibly apply but it did not because an exchange of bonds for bonds by the words of the parenthetical clause was expressly excluded from the class of exchanges described by that subparagraph.

In the Forstmann case, the Collector argued that the court should have considered the Revenue Act of 1921 under which the taxpayer's exchange of debentures for bonds in 1922 was treated as a non-taxable transaction. The court, however, noted that § 113(a)(6) of the 1928 Act did not provide that the basis should be that of the property exchanged in *all* cases of exchanges of property which resulted in no recognized taxable gain or deductible loss under the revenue act in force at the time of exchange. The court held that on the contrary the 1928 Act restricted the use of the substituted basis to those exchanges in which no gain or loss would have been recognized under paragraphs (b), (c), (d), and (e) of § 112 of the 1928 Act. if they had taken place after the effective date of that Act.

The Collector further argued that when Congress provided in § 202(c) of the Revenue Act of 1921 that exchanges of bonds for bonds were tax free it did not intend to exempt the taxpayer from a tax upon the gain arising from the exchange. but merely intended to defer its assessment until the bonds were disposed of by a pure sale or its equivalent. In rejecting the argument, the court held that § 203(b)(1) of the 1924 Act— carried into the Revenue Act of 1928 as § 112(b)—eliminated bonds and stocks from the category of property subject to nontaxable exchange under that section; despite this, in § 204(a)(6)— carried into the Revenue Act of 1928 as § 113(a)(6)—of the same Act, Congress described those exchanges in which the basis for computing gain or loss upon the sale of the property received in the exchange should relate back to the original cost of the property exchanged; in

4. "The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property;" except for certain described exceptions. 26 U.S.C.A. Int.Rev.Acts, page 380.

5. "(6) Tax-free exchanges generally. If the property was acquired upon an exchange described in section 112(b) to (e), inclusive, the basis shall be the same as in the case of the property exchanged, decreased in the amount of any money received by the taxpayer and increased in the amount of gain or decreased in the amount of loss to the taxpayer that was recognized upon such exchange under the law applicable to the year in which the exchange was made. * * *"

6. "No gain or loss shall be recognized if property held * * * for investment (not including * * * bonds * * *) is exchanged solely for property of a like kind to be held * * * for investment."

doing so, there was a reference to § 203(b)(1)—and that section was intended to describe only future exchanges which were to be non-taxable under the 1924 Act but it excluded *all* exchanges of bonds and stocks, even those which had occurred before 1924 when they were non-taxable under the 1921 Act. The result was that any gain realized upon such exchanges would entirely escape taxation. Despite the failure of Congress to include in the statute "a provision obviously desirable", the majority of the court refused to supply the omission "by doing a little legislating * * under the guise of construing the statute." [7]

## Plaintiff's Arguments

Relying on the Forstmann case, plaintiff asks this court to hold that its unadjusted basis for determining gain or loss on its sale of the Venezuelan oil royalties and asphalt rights [8] in the year 1946 is the fair market value on July 12, 1923, of the property then exchanged for those rights (less the cash then received). Plaintiff's arguments are that § 113(a) of the Internal Revenue Code in effect for the taxable year 1946 provided that the basis of property shall be its cost, subject to certain exceptions, none of which applies to this case; cost is determined by reference to the 1923 transaction in which the Venezuelan rights were acquired; plaintiff's conclusion is that since those property rights were acquired in exchange for other property, the cost of the property acquired is the 1923 fair market value of the property given in exchange (less the cash then received).

## Defendants' Arguments

The defendants ask this court to hold that the basis for computing the plaintiff's 1946 gain or loss is the cost or the fair market value on March 1, 1913, of the property interests it acquired on January 17, 1913, under an agreement with Anglo-Saxon together with the cost of any shares of stock it acquired between March 1, 1913 and July 12, 1923, all of which it turned over to Anglo-Saxon and its associated companies on July 12, 1923. Defendants' argument is based on two points: (1) Congress has corrected its failure to include the abovementioned "obviously desirable" statutory provision. (2) Unlike Forstmann, the property plaintiff received in exchange had no "readily ascertainable value" [9] so that when the exchange occurred in 1923 no gain or loss could have been computed; under § 202(c) of the Revenue Act of 1921 in such an exchange neither gain nor loss was recognized; the Forstmann decision did not include a determination of whether or not the exchange in that case was within § 202(c). From these premises, defendants argue that Forstmann was not a decision on the issue whether the exchange of bonds for bonds was within the meaning of § 202(c) of the Revenue Act of 1921; if Forstmann had involved an exchange of property for property without an ascertainable value—as in the case at bar—§ 202(c) of the Revenue Act of 1921 and §§ 112(b)(1) and 113 (a)(6) of the Revenue Act of 1928 would have required the court in the Forstmann case and requires this court to hold that the basis is the cost or March 1, 1913 value and not a stepped-up basis on the date of exchange.

7. Judge Biggs dissented on the ground that the taxpayer's bonds were acquired upon an exchange described in § 112(b) (1) of the Revenue Act of 1928, so that § 113 (a) (6) of the Revenue Act of 1928 fixed the tax base for the bonds. In Judge Biggs' opinion "No gain or loss was recognizable upon the exchange of the bonds for the debentures in 1922 when the exchange was made for Section 202(c) (1) of the Revenue Act of 1921 governed that

exchange. The basis for taxing the bonds therefore is the basis which would be applicable had the taxpayer retained the debentures until 1929 and 1930 and had not exchanged them for the bonds."

8. The property rights sold to Shell will be referred to as "Venezuelan rights."

9. Apparently defendants mean no "readily realizable market value". See § 202(c) of the Revenue Act of 1921.

## C. Decision

The parties agree that the taxpayer's basis for the Venezuelan rights sold to Shell in 1946 is governed by the Internal Revenue Code in force at the time of the sale in 1946. See Forstmann v. Rogers, supra. Unless one of the exceptions set forth in § 113(a) applies to this case, that Code clearly provides that the basis shall be "cost."[10] And since the Forstmann case held that where property is acquired in an exchange, its "cost" is the fair market value, on the date of the exchange, of the property given up, to prevail in this case defendants must persuade the court either that one of the exceptions set forth in § 113(a) applies or that Forstmann is distinguishable.

As a basis for their first point, and in an effort to show that one of the exceptions contained in § 113(a) applies, defendants argue that § 113(a)(12)[11] of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 696, was intended by Congress to correct its failure in earlier Revenue Acts to provide for the carrying forward in a new Revenue Act the basis determined by a prior act for property received by a taxpayer in a tax-free exchange. The court agrees with plaintiff that § 113(a)(12) by its terms does not apply to this case; it applies only if the basis of the property was prescribed by § 113(a) (6), (7) or (9) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, pages 515, 516. None of

such sections prescribes the basis of the property received by plaintiff in the 1923 transaction.

As a basis for their second point, defendants attempt to distinguish Forstmann. The court is unpersuaded, for the court in the Forstmann case in holding that the basis for the taxpayer's gain or loss was the fair market value at the time of the exchange of the debentures given in exchange for the bonds, did so despite the fact that the exchange was tax-free under § 202(c)(1) of the Revenue Act of 1921.[12] And in the case at bar, the 1923 exchange was tax-free under § 202(c) of the Revenue Act of 1921 because the property received by the taxpayer (the Venezuelan rights) had no readily realizable market value.[13]

The crux of defendants' arguments apparently is that "The taxpayer * * seeks to have a portion of the gain or profit not actually realized, recognized or taxed in 1923, exempted from any tax on the final disposition of the property," i. e., plaintiff avoids any tax on the rise in value (above the original cost) while it owned the property rights ultimately given up in 1923. But the same argument was rejected by the Court of Appeals in the Forstmann case [128 F.2d 129] when it refused to do "a little legislating * * * under the guise of construing the statute", although the result was that any realizable gain escaped taxation.[14]

---

10. See footnote 4, supra.

11. "(a) Basis (Unadjusted) of Property. The basis of property shall be the cost of such property; except that—

    * * * * * * *

    "(12) Basis established by Revenue Act of 1932. If the property was acquired, after February 28, 1913, in any taxable year beginning prior to January 1, 1934, and the basis thereof, for the purposes of the Revenue Act of 1932 was prescribed by section 113(a) (6), (7), or (9) of such Act, then for the purposes of this Act the basis shall be the same as the basis therein prescribed in the Revenue Act of 1932."

12. "* * * on an exchange of property * * * for any other such property, no

gain or loss shall be recognized * * * (1) When any such property held for investment, * * * is exchanged for property of a like kind or use; * * *."

13. "* * * on an exchange of property * * * for any other such property, no gain or loss shall be recognized unless the property received in exchange has a readily realizable market value; * * *."

14. "The principle expressed in the Forstmann case would seem to fit more closely into the pattern of the statute. Congress has not attempted to provide that the basis of acquired property should be the same as that of the property surrendered on the exchange if no gain or loss was recognized at the time of the

**458**

In conclusion, the court holds that plaintiff's unadjusted basis for determining its 1946 gain or loss relating to its sale of the Venezuelan rights is the fair market value on July 12, 1923, of the property then exchanged for those rights (less the cash then received).

### (2) The SS. Caribbean Depreciation Issue

#### A. Facts

On December 12, 1942, plaintiff purchased the tanker "SS. Caribbean" from the United States Maritime Commission for $3,054,960.86. Plaintiff paid $781,-670.86 cash at the time of the purchase and the $2,273,290 balance of the purchase price was evidenced by mortgage notes. Between December 12, 1942, and March 8, 1946, plaintiff paid cash to the Commission on account of the mortgage notes in the amount of $681,987. The balance due on the mortgage notes on March 8, 1946, was $1,591,303.

On May 29, 1946, plaintiff filed with the Commission [15] an application for an adjustment in the price of the Caribbean. On October 12, 1948, the Commission advised the plaintiff that an adjustment of $528,480.21 on its mortgage was proposed, before taking into account applicable tax credits. Plaintiff concurred with the Commission's computation, subject to further adjustment covering interest from March 8, 1946.

On April 5, 1949, and January 27, 1950, plaintiff and the Commission agreed that the amount of the adjusted mortgage indebtedness on the Caribbean as of March 8, 1946, before allowance of the tax credit to which plaintiff was entitled under § 9(b)(8) of the Merchant Ship Sales Act of 1946, was to be $1,062,822.79. The amount of the tax credit was subsequently determined to be $173,522.31 resulting in an adjusted mortgage indebtedness as of March 8, 1946, of $889,300.48 after application of the tax credit.

Subsequent to March 8, 1946, plaintiff paid $681,987 to the Commission to reduce the mortgage indebtedness. These payments consisted of $227,329 on December 15, 1946, 1947, and 1948. On July 22, 1949, the unpaid balance of the adjusted mortgage indebtedness was $207,313.48. The adjusted mortgage indebtedness was satisfied in full on that date by payment by plaintiff to the Commission of $122,582.56, and the crediting by the Commission against the mortgage indebtedness of excess interest of $84,730.92 paid by plaintiff to the Commission for the period March 8, 1946, to December 14, 1948; the latter amount was disallowed by the Commissioner of Internal Revenue as a deduction.

Upon examination of plaintiff's consolidated corporation income tax return for the taxable year 1946, the Commissioner of Internal Revenue determined that the depreciable cost (exclusive of improvements) of the Caribbean on March 8, 1946, was $1,555,828.97 and that for the period March 8, 1946, to December 31, 1946, plaintiff was entitled to depreciation in the amount of $75,974.70.

Plaintiff contends that the depreciable cost (exclusive of improvements) of the Caribbean on March 8, 1946, should be $2,352,958.34, and that it is entitled to have the depreciation for the period March 8, 1946, to December 31, 1946, computed on that amount, plus improvements.

#### Arguments

The taxpayer contends that the cost of the SS. Caribbean was $2,352,958.34, representing the original purchase price

exchange. It has attempted * * * to fix the basis by reference to specific non-recognition provisions of the statute. This method has its dangers as the result in the Forstmann case clearly indicates. Occasional avoidance of tax as well as occasional hardship in certain cases to the taxpayer does not justify a departure from the method that Congress has adopted." 3 Mertens, Law of Federal Income Taxation, Sec. 21.80 at p. 462 (1942 ed.).

15. Section 9 of the Merchant Ship Sales Act of 1946. Act of March 8, 1946, C. 82, 60 Stat. 41, 50 U.S.C.A.Appendix, § 1742.

of $3,054,960.86 less the reduction in price of $702,002.52 granted by the Maritime Commission. This cost, taxpayer argues, should be its basis for computing depreciation on the vessel for the purpose of federal income tax.

Defendants contend that the taxpayer's basis for computing depreciation should be $1,638,688.97,[16] which is both the actual cost of the vessel and its "statutory sales price" as defined by the Merchant Ship Sales Act of 1946.[17]

The computations of the parties differ by $714,269.37, the amount which defendants argue should not be considered as part of plaintiff's cost of the vessel. The defendants admit that plaintiff made total "payments" of $2,352,958.34, but they argue that the total "cost" of the vessel was $1,638,688.97. They contend that the $714,269.37 difference was due to certain adjustments required by the Merchant Ship Sales Act of 1946 to enable plaintiff to purchase the vessel at the statutory sales price of $1,638,688.-97. As set forth in defendants' brief, those adjustments were:

| | | |
|---|---|---|
| Total charter hire paid to taxpayer by the United States from 12/12/42 to 3/8/46 which taxpayer had to repay to the United States. | | $1,232,876.71 |
| Credits allowed to taxpayer against its liability for charter hire: | | |
| (a) Interest on original purchase price from 12/12/42 to 3/8/46 at 3½% | $345,085.03 | |
| (b) Tax credit computed by allowing benefit to taxpayer for tax paid on charter hire income and disallowing benefit for deduction for depreciation allowed from 12/12/42 to 3/8/46 | 173,522.31 | 518,607.34 |
| Charter hire repayable after allowance of credits. | | $ 714,269.37 |

On the basis of such computations, defendants conclude that of the $2,352,-958.34 "paid" by plaintiff, $714,269.37 "represents not a payment for the 'S.S. Caribbean' but rather a refund due the Commission" under the Act. In rebuttal, plaintiff argues that defendants' computation composed of the cash actually paid by the taxpayer ($2,352,958.34) less the net amount of the § 9 credits ($714,269.-37) is incorrect because "the credits were already taken into consideration in determining the cash payment required to complete the purchase of the vessel. It is manifestly incorrect to take them into consideration a second time by deducting them from the amount of the cash payments in arriving at the taxpayer's tax cost of the vessel."

## B. Law

Depreciation amount is computed upon a "cost" basis.[18] It is not disputed that plaintiff "paid" the following amounts: (1) $781,670.86;[19] (2) $681,-

---

16. The court notes that the Commissioner of Internal Revenue's depreciable cost figure ($1,555,828.97) inexplicably differs from that now urged by the defendants ($1,638,688.97).

17. 50 U.S.C.A.Appendix, § 1735 et seq.

18. Sections 114(a), 113(b), 113(a) of the Internal Revenue Code in effect for taxable year 1946.

19. 12/12/42 cash at time of original purchase.

987.00;[20] (3) $681,987.00;[21] (4) $122,-582.56;[22] (5) $84,730.92.[23] In computing "cost," however, defendants subtract $714,269.37 (which they characterize as a "refund due the Commission") from that $2,352,958.34 total. The correctness of that subtraction is the perplexing problem for the court.

The express purpose of the Act is to foster the development and encourage the maintenance of an efficient and adequate American-owned Merchant Marine.[24] The Act granted to any United States citizen the right to apply to the United States Maritime Commission to purchase a war-built vessel, under the jurisdiction and control of the Commission, at the statutory sales price.[25] Prior to the end of World War II, many vessels were sold (including the sale to plaintiff) by the Government to private purchasers. To equalize the cost to those prior purchasers with the cost to subsequent purchasers, § 9 of the Act[26] provided a formula for an adjustment in the original purchase price. Section 9 of the Act recites that the adjustment shall be made by treating the vessel as if it were being sold on March 8, 1946, (the date of the enactment of the Act). The amount of the adjustment is determined by a complex formula set forth in § 9(b) (1-8).

### C. Decision

The court agrees with plaintiff's contention that its "cost" was the amount it "paid," as listed supra. The original debt was $3,054,960.86. Subsequently, plaintiff paid $1,463,657.86, so that on May 29, 1946, when plaintiff applied for a statutory reduction in its debt, that debt was $1,591,303. Pursuant to the statute, by various accounting adjustments that debt was reduced to $889,-300.48; subsequently plaintiff paid such amount.[27] Defendants have raised a false issue by arguing that $714,269.37 of the amount paid by plaintiff was not a "payment" but was a net amount "refunded" to the United States for plaintiff did not, in fact, repay the disputed $714,-269.37 to the Commission. The ultimate result of all of the § 9 adjustments (of which the $714,269.37 credit to the United States was one) was that plaintiff ultimately paid an additional $889,300.48, whereas if the credit had not been computed plaintiff would have had to pay only $175,031.11. Even though the $714,269.-37 might be characterized as a "refund" to the Commission, it was not actually paid to the Commission by plaintiff and it would be mathematically erroneous to subtract it from plaintiff's payments. In fact, in computing the § 9 adjustments, after the $714,269.37 accounting credit was given to the Commission, nevertheless, the Commission determined plaintiff's debt to be $889,300.48. The $714,-269.37 credit to the Commission merely was one of the statutory adjustments and as such it did not transform plaintiff's earlier ($1,463,657.86) and subsequent ($889,300.48) payments or a portion thereof into "refunds" or not-out-of-pocket payments. The "refund" was, in fact, an accounting credit; it was not an actual refund payment. Thus, in computing plaintiff's "cost" it would be mathematically improper and manifestly unfair to subtract from the total payments

20. 12/12/42-3/8/46 payments on mortgage notes.

21. 12/15/46-12/15/48 payments on mortgage notes.

22. July 22, 1949 payment on adjusted mortgage indebtedness.

23. July 22, 1949 credit by Commission against the mortgage debt (defendants do not deny that the amount is a portion of plaintiff's "cost.").

24. 50 U.S.C.A.Appendix, § 1735.

25. 50 U.S.C.A.Appendix, § 1737. " 'Statutory sales price' " is defined: " * * * in the case of a dry-cargo vessel, an amount equal to 50 per centum of the prewar domestic cost of that type of vessel, and in the case of a tanker, such term means an amount equal to 87½ per centum of the prewar domestic cost of a tanker of that type * * *." such amount in each case being adjusted as set forth in the Act. 50 U.S.C.A.Appendix, § 1736.

26. 50 U.S.C.A.Appendix, § 1742.

27. See payments (3), (4), and (5) listed, supra.

by plaintiff an amount merely credited in favor of the Commission—in order to determine the ultimate amount due—but never actually refunded to it.

In conclusion, the court holds that plaintiff is entitled to compute depreciation on the basis of the payments made by it, totaling $2,352,958.34.

The opinion is the court's findings of fact and conclusions of law.

An order may be submitted in conformity with the opinion herein expressed.