**UNITED STATES of America, Appellant,**

v.

**WATERMAN STEAMSHIP CORPORATION, Appellee.**

**No. 20040.**

United States Court of Appeals Fifth Circuit.

March 30, 1964.

Rehearing Denied May 4, 1964.

Atty., Dept. of Justice, Washington, D. C., Vernol R. Jansen, U. S. Atty., Mobile, Ala., Morton Hollander, Stephen B. Swartz, I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., for appellant.

John W. McConnell, Jr., William H. Armbrecht, Armbrecht, Jackson, McConnell & DeMouy, Mobile, Ala., for appellee, Armbrecht, Jackson, McConnell & DeMouy, Mobile, Ala., of counsel.

Before RIVES, CAMERON and HAYS,* Circuit Judges.

RIVES, Circuit Judge.

This suit for refund of income taxes for the years 1947 through 1950 was tried by the district court without a jury. Pursuant to a carefully considered opinion reported as Waterman Steamship Corporation v. United States, D.C., 203 F.Supp. 915, the court entered judgment for the taxpayer Waterman in the total amount of $2,241,388.30, together with interest. On appeal there is no complaint as to the rulings on the three issues which the district court captioned: "I. WATERMAN BUILDING" (203 F.Supp. 917–921), "II. BABY FLAT-TOPS" (Id. 921–925), and "IV. ALABAMA STATE TAX" (Id. 926–928). The remaining questions are: (1) whether Waterman is entitled to a foreign tax credit under section 131 of the Internal Revenue Code of 1939 for certain taxes paid to the Republic of the Philippines;[1] (2) whether the district court correctly determined Waterman's cost basis for depreciation of eighteen vessels whose sales prices were adjusted pursuant to the Merchant Ship Sales Act of 1946;[2] (3) whether the district court correctly held that interest paid by Waterman on Government-advanced progress payments was properly included in "the original purchase price" of eighteen vessels for purposes of the price adjustment authorized by section 9 of the Merchant Ship Sales Act of 1946.

David I. Granger, Sherman L. Cohn, Attys., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson,

* Of the Second Circuit, sitting by designation.

1. 14 Philippine Annotated Laws, Title 72.

2. Chapter 82. 60 Stat. 41 (50 U.S.C.A. Appendix, 1952 ed., § 1735).

### 1. The Foreign Tax Credit Issue.

The facts pertaining to this issue as stipulated by the parties and found by the district court appear at page 925 of 203 F.Supp.

Generally taxes are allowed as deductions in computing income taxes, rather than as credits against the tax itself.[3] The primary purpose of the provision for credit of foreign income taxes which first appeared in the Revenue Act of 1918 was to mitigate the evil of double taxation. In the case of domestic corporations there was also a purpose to facilitate their foreign enterprises. Burnet v. Chicago Portrait Co., 1932, 285 U.S. 1, 7, 9, 52 S.Ct. 275, 76 L.Ed. 587; New York & H. Rosario Min. Co. v. Commissioner, 2 Cir. 1948, 168 F.2d 745, 12 A.L.R.2d 355.

At first the Act allowed as a credit against the tax simply "[t]he amount of income, war-profits and excess-profits taxes imposed by foreign countries, etc." I.R.C.1939, sections 31 and 131(a) (1). Under that provision there has never been any contention but that Waterman is entitled to a foreign tax credit for the taxes paid to the Republic of the Philippines pursuant to Title II, Income Tax, of the Philippine National Internal Revenue Code (14 Philippine Annotated Laws, Title 72). The taxes as to which credit is questioned are those paid pursuant to Title V, Privilege Taxes on Business and Occupation. The nature of the taxes is indicated by the following brief quotations from sections 178 and 192 of Title V:

"Sec. 178. *Payment of privilege taxes.*—A privilege tax must be paid before any business or occupation hereinafter specified can be lawfully begun or pursued. * * *"

"Sec. 192. *Percentage tax on carriers and keepers of garages.*—Keepers of garages, transportation contractors, persons who transport passengers or freight for hire, and common carriers by land, air, or water, except owners of bancas, and owners of animal-drawn two wheeled vehicles, shall pay a tax equivalent to two *per centum* of their gross receipts * * *."

The district court sustained Waterman's claim for a foreign tax credit for the Title V privilege taxes paid to the Philippines under section 131(h) of the 1939 Internal Revenue Code, which reads:

"(h) [as added by sec. 158(f), Revenue Act of 1942, c. 619, 56 Stat. 798.] *Credit for Taxes in Lieu of Income, etc., Taxes.* For the purposes of this section and section 23 (c) (1), the term 'income, war-profits, and excess-profits taxes' shall include a tax paid in lieu of a tax upon income, war-profits, or excess-profits otherwise generally imposed by any foreign country or by any possession of the United States."

As indicated, section 131(h) was added in 1942. Its intent was to extend the scope of the section, and the limits of that extension appear both from the plain wording of the section and from the report of the Senate Finance Committee accompanying the Act:

"In the interpretation of the term 'income tax,' the Commissioner, the Board, and the courts have consistently adhered to a concept of income tax rather closely related to our own, and if such foreign tax was not imposed upon a basis corresponding approximately to net income it was not recognized as a basis for such credit. Thus if a foreign country *in imposing income taxation* authorized, for reasons growing out of the administrative difficulties of determining net

---

3. Internal Revenue Code of 1939:
   "§ 23. *Deductions from gross income.*
   "In computing net income there shall be allowed as deductions:
   " * * * * *

[As amended by sec. 202(a), Revenue Act of 1941, c. 412, 55 Stat. 687.]
   "(c) *Taxes generally.*
   "(1) *Allowance in general.* Taxes paid or accrued within the taxable year * * *."

income on taxable basis within that country, a United States domestic corporation doing business in such country *to pay a tax in lieu of such income tax but measured, for example, by gross income, gross sales or a number of units produced within the country,* such tax has not heretofore been recognized as a basis for a credit. Your committee has deemed it desirable to extend the scope of this section. Accordingly, * * * the term 'income, war profits, and excess profits taxes' shall, for the purpose of sections 131 and 23(c) (1), include a tax paid by a domestic taxpayer *in lieu of the tax upon income, war profits, and excess profits taxes which would otherwise be imposed upon such taxpayer* by any foreign country or by any possession of the United States." (Emphasis added.)

S.Rep.No.631, 77th Cong., 2d sess., p. 131 (1942–2 Cum.Bull. 504, 602).

Under section 131(h) the extension was to "include a tax paid in lieu of a tax upon income, war-profits, or excess-profits otherwise generally imposed by any foreign country." That the quoted language accurately expressed the congressional intent clearly appears from that part of the language in the Senate Report which we have emphasized. That report explicitly states that the scope of the section was extended to cover the case where "a foreign country in imposing income taxation" authorized the payment of "a tax in lieu of such income tax but measured, for example, by gross income,

gross sales, etc." The section was not extended so far as to cover every tax measured by gross income, gross sales, or gross receipts.

Waterman made no showing that the Title V privilege tax at issue was levied in lieu of an otherwise generally imposed income or profits tax, and the district court made no such finding unless it be in the following statement:

"Where, as here, the administrative problem of collecting an income tax from foreign corporations leads the taxing authority to impose additional taxes as a means of bolstering the nation's income producing revenue, it is the duty of the taxing authorities in this country to allow a credit for the additional tax if it is in the nature of an income, war-profits, or excess-profits tax as those terms are understood in this country." 203 F. Supp. at p. 926.

There is no evidence in the record to support that statement. As the statute itself and the Senate Committee Report plainly state, one inquiry under section 131(h) is whether the tax was levied by the foreign country in place of or instead of or as a substitute for some existing income or profits tax.[4]

■ Referring to Treasury Regulation 118, § 39.131(h)–1(b) [5] the district court said: "If taken in its plain meaning, the Treasury Regulation would seem to preclude a tax credit in the instant case since the amount paid the Philippine government was assessed under two different titles of the Philippine Code."

4. See Commissioner v. American Metal Co., 2 Cir. 1955, 221 F.2d 134; Motland v. United States, N.D.Iowa 1961, 192 F.Supp. 358; Guantanamo & Western Railroad Co. v. Commissioner, 31 T.C. 842 (1959); Abbot Laboratories International Co. v. United States, N.D.Ill.1958, 160 F.Supp. 321, aff'd per curiam, 267 F. 2d 940 (7th Cir. 1959); Compania Embotelladora Coca-Cola S. A. v. United States, 1956, 134 Ct.Cl. 723, 139 F.Supp. 953; Northwestern Mut. F. Ass'n v. Commissioner, 9 Cir. 1950, 181 F.2d 133. See also, Annotation, 12 A.L.R.2d 359 and supplemental citations.

5. Which continued Treasury Regulations 111, § 29.131–2 in pertinent part as follows:
"Sec. 29.131–2. *Meaning of Terms.*— * * * For the purposes of section 131 and section 23(c) (1) the term 'income, war-profits, and excess-profits taxes' includes a tax imposed by statute or decree by a foreign country or by a possession of the United States if (a) such country or possession has in force a general income tax law, (b) the taxpayer claiming the credit would, in the absence of a specific provision applicable to such taxpayer, be subject to such general in-

(203 F.Supp. 925, 926.) Waterman, in brief, vigorously attacks the validity of that regulation and claims that it "abrogated entirely the purpose of extending the scope of section 131." We need not examine that question because Waterman has made no showing to bring the Title V privileges taxes within the scope of the statute unaided by the regulation.

### 2. Cost Basis of Vessels for Depreciation.

For the purpose of the depreciation issue the facts were also stipulated, and are fairly stated by the district court in 203 F.Supp. at 928. The difference between the amounts contended for as the proper cost basis of the vessels for depreciation is $8,818,838.55.

The district court decided this issue in favor of the plaintiff taxpayer in line with earlier decisions in Barber Oil Corporation v. Manning, D.C.N.J.1955, 135 F.Supp. 451, 458–461, and Socony Mobil Oil Co. v. United States, Texaco, Inc. v. United States, Mississippi Shipping Co. v. United States, Ct.Cl.1961, 287 F.2d 910. Later the District Court for the District of Delaware, in an extensive opinion, declined to agree with any of the earlier decisions and decided the issue in favor of the United States. National Bulk Carriers, Inc. v. United States, D.C.Del.1963, 214 F.Supp. 585.[6]

After careful study, we are constrained to agree with the District of Delaware, and set forth briefly the reasons which lead us to that decision. The language of the statute and its legislative history show that Congress intended pre-enactment purchases to be treated as if the sale had occurred on the date of enactment, that is, on a parity with post-enactment purchases. That is explicitly stated in the opening paragraph of section 9(b): ·

> "(b) Such adjustment shall be made, as hereinafter provided, by treating the vessel as if it were being sold to the applicant on the date of the enactment of this Act, [March 8, 1946] and not before that time. The amount of such adjustment shall be determined as follows: * * *."

Of the subparagraphs which follow, some provide for a decrease in the cash down payment and mortgage indebtedness [sections 9(b) (1), (2), (3) and (4)] which would adjust the purchase price to conform to the statutory sales price provided by section 3(d) (4). Other subparagraphs provide for adjustments which compensate the purchaser for his investment [section 9(b) (5)], restore charter hire paid or that should have been paid [section 9(b) (6)], and return taxes and tax benefits due to pre-enactment ownership [sections 9(b)(8) and 9(c)(1)]. Those items, which are not capital in nature, do not enter into the computation of cost for purposes of depreciation.

The legislative history of section 9 is set forth at some length in the opinion of the Delaware District Court in 214 F.Supp. at pp. 591–593 and leads to the same conclusion. It was clearly the in-

come tax, and (c) such general income tax is not imposed upon the taxpayer thus subject to such substituted tax. For example, the A Corporation does business in the X country, which imposes an income tax upon substantially a net income base. The ascertainment of net income, though not the determination of gross income, from sources in X country is found administratively difficult. The X country, by decree, provides that corporations circumstanced as was the A Corporation would, in lieu of the income tax at the rate of 20 per cent otherwise payable, be subject to tax at the rate of 10 per cent upon the amount of gross income from X country. In accordance with such decree, the A Corporation paid X country the sum of $25,000 in 1943 with respect to its tax liability to the X country for the year 1942. Such amount, subject to the applicable limitations, is available as a credit to the A Corporation as foreign income, war-profits, or excess-profits taxes against the United States tax liability for the year 1942."

6. Attached as Appendix A to that opinion at 214 F.Supp. 597–599 is the full text of the pertinent Section 9 of the Merchant Ship Sales Act of 1946.

tention of Congress to put pre-enactment purchasers and post-enactment purchasers on the same basis, that of the statutory sales price.

### 3. Interest on Progress Payments.

■ This issued raised by the Government's counterclaim is whether the district court erred in including interest paid by Waterman on Government-advanced progress payments in the calculation of the "original purchase price" of the eighteen vessels. Several other questions originally raised by counterclaim were either withdrawn in the district court or decided against the Government (see 203 F.Supp. 932–934), and are not urged on appeal. We agree with the district court's disposition of this issue (see 203 F.Supp. 930–932). In New York & Cuba Mail Steamship Co. v. United States, 1959, 145 Ct.Cl. 652, 688, 172 F. Supp. 684, 688, the Court of Claims said:

> "The Maritime Commission in all such situations treated the interest accrued during the construction period as a part of the capital cost of the ship. We think that, as a matter of sound accounting practice, and of logic, that treatment was right."

Reaching the same result, the Delaware District Court in National Bulk Carriers, Inc. v. United States, supra, noted that great weight should be given to the interpretation of the Act by the Maritime Commission charged with its administration and enforcement, and further:

> "By interpreting 'original purchase price' to be the total cost to the buyer—contract price plus interest—the basic intent of Congress is furthered. Neither the post-war nor pre-Act buyer has any competitive advantage. They both pay the same price for the ship, the statutory sales price." (214 F.Supp. at 596.)

The full treatment accorded this issue by the district court in this case, and by the Delaware District Court in the National Bulk Carriers' case, makes further discussion unnecessary.

The judgment of the district court is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

CAMERON, Circuit Judge (concurring in part and, in part, dissenting):

The decision of the majority of the items designated "1. *Foreign Tax Credit Issue*" and "3. *Interest on Progress Payments*" accords with my own views, and in the decision on these issues I concur. The holding of the majority on the issue designated "2. *Cost Basis of Vessels for Depreciation*" goes so far afield of my own view that I am constrained to state my views in a brief dissent.

Admittedly, there is no clear statutory authority for the decision of the majority that Appellee's basis for depreciation of the vessels which form the subject of this litigation must be reduced by the $8,818,839.55 in dispute, which amount represents reductions in the *additional* amount of the cost of said vessels to be paid under the purchase contracts as originally executed. The majority appears to adopt the conclusion of the District Court of Delaware in National Bulk Carriers, Inc. v. United States, D.C.Del.1963, 214 F.Supp. 585. That court, basing its holding solely upon its reading of the legislative history of Section 9 of the Merchant Ship Sales Act of 1946, 50 U.S.C., Appendix, 1952 ed., Sec. 1742 states as its conclusion:

> "A decision for the taxpayer would be contrary to the equitable principles that motivated the Congress to act. A larger depreciation basis for war-time buyers for the same class of ships would give them a substantial competitive advantage over similar (sic) situated, post-war buyers. With the language and the background of the legislation in mind, the Government must prevail." 214 F.Supp. at page 593.

The legislative history of this statute does not, in my opinion, support this conclusion. Indeed, the Chief Judge of the District Court himself recognized the un-

certain area into which his opinion ventured when, in the paragraph preceding that above quoted, he said:

"It is for the Supreme Court or Congress to conclusively determine this problem." Ibid. 214 F.Supp. at page 593.

I find no such uncertainty or obscurity in the congressional intent on the point in issue. The basis of property for the purpose of computing depreciation is determined by statute, § 113(a), Internal Revenue Code of 1939, 26 U.S.C.:

"The basis of property shall be the cost of such property; except that —."

There follow in subsections (1) through (23) enumerated exceptions to the quoted rule, none of which even remotely touches upon this problem.

"These and the other provisions upon which they depend create exceptions to a general rule and should not be extended by implication or otherwise to situations not expressly provided for." (Referring to predecessors to §§ 113(a) (1) et seq.) Central National Bank, 29 BTA 530.

When Congress intended that its acts authorizing the redetermination of the price of ships purchased under our various subsidized ship procurement programs would also determine the basis of property in a manner differing from § 113(a), supra, or would determine other factors affecting income tax liability of purchasers, it has always said so specifically.[1]

§ 9(b) (8) of the Merchant Ship Sales Act of 1946, supra, (the statute construed by the majority opinion to support its conclusion) specifies how the income tax effect of its re-framing of the purchase price shall be treated:

"There shall be subtracted from the sum of the credits in favor of the Commission under the foregoing provisions of this subsection the amount of any overpayments of Federal taxes by the applicant resulting from the application of subsection (c) (1) [of this section], and there shall be subtracted from the sum of the credits in favor of the applicant under the foregoing provisions of this subsection the amount of any deficiencies in Federal taxes of the applicant resulting from the application of subsection (c) (1) [of this section]. If, after making such subtractions, the sum of the credits in favor of the applicant exceeds the sum of the credits in favor of the Commission, such excess shall be paid by the Commission to the applicant. If, after making such subtractions, the sum of the credits in favor of the Commission exceeds the sum of the credits in favor of the applicant, such excess shall be paid by the applicant to the Commission.

[1]. For example, § 510 of the Merchant Marine Act of 1936 (46 U.S.C. § 1160(e):
"No gain shall be recognized to the owner for the purpose of Federal income taxes in the case of a transfer of an obsolete vessel to the Federal Maritime Board or Secretary of Commerce under the provisions of this section. The basis for gain or loss upon a sale or exchange and for depreciation under the applicable Federal income-tax laws of a new vessel acquired as contemplated in this section shall be the same as the basis of the obsolete vessel or vessels exchanged for credit upon the acquisition of such new vessel, increased in the amount of the cost of such vessel (other than the cost represented by such obsolete vessel or vessels) and decreased in the amount of loss recognized upon such transfer."

And § 511 of that Act (46 U.S.C. § 1161):
"The basis for determining gain or loss and for depreciation, for the purposes of Federal income or excess profits taxes, of any new vessel constructed, reconstructed, reconditioned, or acquired by the taxpayer, or with respect to which purchase-money indebtedness is liquidated as provided in subsection (g) of this section, in whole or in part out of the construction reserve fund shall be reduced by that portion of the deposits in the fund expended in the construction, reconstruction, reconditioning, acquisition, or liquidation of purchase-money indebtedness of the new vessel which represents gain not recognized for tax purposes under subsection (c) of this section."

Upon such payment by the Commission or the applicant, such overpayments shall be treated as having been refunded and such deficiencies as having been paid."

It seems, therefore, abundantly clear that Congress has uniformly spelled out any exception to the rule of § 113(a), supra, which it intended to apply.

On the point here in issue, the House of Representatives did consider a bill which would have provided specifically such an exception, and the result Appellant seeks (see H.R. 3603, 79th Congress, 1st Session), which was not passed. The Senate likewise considered, and indeed enacted a bill including as § 9(e)(1) thereof a provision which also would have produced this result. It provided:

"If an adjustment in the purchase price of a vessel is made under this Section, the income and excess profits taxes of the vessel owner under the Internal Revenue Code for the taxable year within which the delivery of the vessel was made to the purchaser and for *subsequent taxable years*, shall be redetermined. For such purposes of redetermination *the vessel shall be considered as having been acquired at the adjusted* purchase price, and the income and deductions attributable to such vessel shall be determined as if this Section had been in effect on the date of such delivery." [Emphasis added.] See consideration of H.R. 3603, 79th Congress, 1st Session in the Senate, December 4, 1945 (Legislative day October 29, 1945).

However, in conference, this provision was eliminated, and the statute we are here considering was approved. (See House Conference Report No. 1526, 79th Congress, 2nd Session, to accompany H.R. 3603, dated February 6, 1946) and subsequently enacted by both Houses as the Merchant Sales Act of 1946, supra.

Moreover, when the executive branch, acting by and through the Commissioner of Internal Revenue of the Treasury Department, undertook to write in by administrative action that which Congress had refused to enact, in Mimeograph 6366, 1949–1 C.B. 270, the 81st Congress, in H.R. 3419, passed by both Houses but vetoed by President Truman (see 96 Cong. Rep. P.p 15, 79102), enacted a bill which provided the precise treatment here sought by Appellee.

I do not agree with the District Court of Delaware (in 214 F.Supp. page 593) that " * * * these statements are entitled to little or no weight" because of the holding of Fogarty v. United States, 340 U.S. 8, 71 S.Ct. 5, 95 L.Ed. 10. Here we have no effort of a much later Congress to supplant the views of its predecessor; but, to the contrary, the second Congress following, expressing itself through the *same* committees, supporting and implementing the act of the earlier Congress. It is difficult to conceive of a clearer exposition of legislative intent than the sum of the foregoing actions.

The Congress manifestly intends that § 113(a), supra, shall be applied to determine the basis of these vessels; that the basis is "the cost of such property."

The word "cost" used in this context has a clear meaning:

"The amount in value paid, charged, or engaged to be paid for anything bought or taken in barter." Webster's new Twentieth Century Dictionary, Standard Reference Works, 1956 Edition.

It is undisputed in this record that Appellee had paid in cash $16,235,446.21, on account of the purchase price of the subject vessels, prior to the redetermination of its price (R. 75, 83); that the Adjusted Basis of vessels traded in thereon was $175,876.40 (R. 75, 83); that Appellee paid the additional sum of $86,037.70 upon settlement of the adjusted price (R. 84), and that the mortgage debt to be paid thereon, after crediting thereto all adjustments, including the $8,818,838.55 here in controversy, was $10,182,779.04 (R. 79). The total paid or to be paid for these vessels is therefore $26,680,139.35. This is the "cost"

and this is the basis under § 113(a), supra.

When the foregoing is considered together with the comprehensively documented opinion of the Court of Claims in Socony Mobil Oil Co., Inc. et al. v. United States, 287 F.2d 910, the decision of the District Court of New Jersey in Barber Oil Corporation v. Manning, 135 F.Supp. 451, and Judge Thomas' carefully considered opinion in this action below, a decision for Appellee appears absolutely compelled.

Therefore, believing that to hold otherwise represents a clear departure from the legislature's plainly express intention, I respectfully dissent from the majority's holding as to point 2, "Cost Basis of Vessels for Depreciation."

ON PETITION FOR REHEARING

Before RIVES and HAYS*, Circuit Judges.**

PER CURIAM:

The appellee's petition for rehearing is

Denied.

---

* Of the Second Circuit, sitting by designation.

** Judge Cameron participated in the decision of this case on original hearing, concurring in part and dissenting in part, but died before the petition for rehearing was filed.