C. M. Gooch Lumber Sales Company, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 403–66.   Filed March 21, 1968.

*Harry W. Wellford* and *Tennie C. Leonard*, for the petitioner.
*David E. Mills*, for the respondent.

654

OPINION

The principal question before us is whether petitioner is entitled to a bad debt deduction under section 166(a)[2] for the unpaid balance of non-interest-bearing "open account" advances to a related company which petitioner represented as a sales agent.[3] The resolution of this question turns upon the proper characterization of the advances, petitioner contending that they represented bona fide indebtedness and respondent asserting that they were capital in nature, having been placed entirely at the risk of the business without expectation of repayment.

Both parties have sought to becloud the critical issue by emphasizing essentially peripheral considerations. Thus, petitioner seeks to draw sustenance from the fact that it made similar advances to other companies which it also represented, ignoring the fact that in the area of

---

[2] SEC. 166. BAD DEBTS.

   (a) GENERAL RULE.—

      (1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

      (2) PARTIALLY WORTHLESS DEBTS.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt in an amount not in excess of the part charged off within the taxable year, as a deduction.

   Unless otherwise stated, all references herein are to the Internal Revenue Code of 1954.

[3] The parties agree that any bad debt deduction to which petitioner may be entitled should be allowed in fiscal 1963.

bad debts the significant element is the current and prospective economic and financial condition of the particular debtor.[4] Respondent's arguments reflect a deep-seated concern over alleged shuffling of funds between related entities, including a tax-exempt foundation, despite the fact that he has raised no issue of loss of exemption or of reallocation of income or deductions.

Our focus is therefore directed to a determination of the true nature of the financial arrangements between petitioner and Harriston Lumber. The decided cases considering the question whether a purported indebtedness is in fact a debt for tax purposes expound a myriad of tests and criteria; in the final analysis, however, the question depends upon the particular facts and circumstances of each case, with the taxpayer bearing the burden of proof. E.g., *John Kelley Co.* v. *Commissioner*, 326 U.S. 521, 530 (1946); *Gooding Amusement Co.* v. *Commissioner*, 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408 (1954); *Malone & Hyde, Inc.*, 49 T.C. 575 (1968). Our task is to examine the particular facts before us in light of "the realities of the business world and the manner in which transactions are handled in the normal and ordinary course of doing business." *Malone & Hyde, Inc., supra.* At the same time we recognize that, although the affiliation which existed between petitioner and Harriston Lumber and the complex of Gooch companies is not an insuperable barrier to petitioner's position, it does "invite close scrutiny." See *Kraft Foods Co.* v. *Commissioner*, 232 F. 2d 118, 123 (C.A. 2, 1956); *Malone & Hyde, Inc., supra.*

The essential ingredient in cases of this type is a factual determination whether the parties in good faith intended the advances to be loans. The absence of a written debt instrument, security, or provision for payment of interest is not controlling; formal evidences of indebtedness are at best clues to proof of the ultimate fact. *Byerlite Corporation* v. *Williams*, 286 F. 2d 285, 290 (C.A. 6, 1960). Contrariwise, we are not entitled to rewrite a balance sheet merely by substituting our own judgment of what we would have done had we been in the taxpayer's position. *Rowan* v. *United States*, 219 F. 2d 51, 55 (C.A. 5, 1955); *Malone & Hyde, Inc., supra.* We can and should, however, evaluate whether, under the particular facts and circumstances, there was a reasonable expectation of repayment in light of the economic realities of the situation. *Wilfred J. Funk*, 35 T.C. 42 (1960); *Caroline D. Thompson*, 22 T.C. 507 (1954).

It is in the foregoing setting that we analyze the facts herein. A basic purpose for petitioner's advances to its principals (including not only

---

[4] Beyond this, petitioner's reference to other similar arrangements assumes that the advances to the other companies constituted bona fide indebtedness, which assumption may well be unwarranted. It is equally possible that such advances would not be so characterized for tax purposes if this question was before us herein, which it is not.

Harriston Lumber but other Gooch enterprises) was the assurance of a supply of lumber for its activities as sales agent; the advances enabled the principals to finance their inventory requirements and operating expenses. Cf. *Main* v. *United States*, an unreported case (W.D. Wash. 1966, 18 A.F.T.R. 2d 5601, 66–2. U.S.T.C. par. 9636). We think it of some significance that the advances were reflected in a "running" rather than "static" open account between petitioner and Harriston Lumber. Petitioner actually collected the net proceeds of sales which it made on behalf of Harriston Lumber. Instead of remitting such proceeds to Harriston Lumber, however, petitioner applied them against the then outstanding balance in the "running" account. This procedure is markedly different from the situation in which straight cash advances are allowed to build up without any repayments. The open account arrangement herein was clearly designed to reflect "mutually offsetting business dealings based on continuing credit and intermittent, but assured, repayment." See *Northeastern Consolidated Co.* v. *United States*, 279 F. Supp. 592 (N.D. Ill. 1967) ; *American Processing & Sales Co.* v. *United States*, 371 F. 2d 842, 854 (Ct. Cl. 1967). Until June 30, 1960, we think that the account fulfilled precisely such function. After that date, however, a careful evaluation of Harriston Lumber's condition and prospects dictates the conclusion that it was clearly unrealistic for petitioner to continue its credit arrangement with Harriston Lumber. Admittedly, it is difficult to pinpoint the precise time at which advances no longer are entitled to treatment as loans. But the difficulty of the challenge does not justify our seeking refuge in an all-or-nothing approach. To allow the claimed deduction in toto would clearly be unwarranted, as would a disallowance in toto under the guise of the failure of petitioner to meet its burden of proof. Either extreme would yield a result far removed from reality.

Petitioner attributes the steadily increasing balance in the running account to the fact that Harriston Lumber, as well as the other Gooch enterprises, was experiencing lean years because of the depressed condition of the lumber industry. Better times were expected, however, and, for that reason, it was decided to keep Harriston Lumber operating. At the time of its inception in 1957, we are satisfied that Harriston Lumber had at least a plausible chance of success.[5] Concomitantly,

---

[5] We recognize that the predecessor corporation, Harriston Hardwood, with whom petitioner had dealt on a similar basis, had enjoyed continued success in past years. Cf. *George E. Warren Corporation* v. *United States,* 135 Ct. Cl. 305, 141 F. Supp. 935 (1956). Nevertheless, an examination of the financial statements of both companies indicates that they were quite different animals. Harriston Lumber started out with and continued to have substantially greater obligations than did Harriston Hardwood at the time of its liquidation, in terms of outstanding indebtedness and fixed rental and interest charges. The marked difference in the financial condition of the two companies makes for an inexact comparison and clearly indicates that Harriston Lumber had substantially lesser capacity to survive the long pull. Consequently, the experience of Harriston Hardwood has less probative value than might otherwise be the case.

there was a reasonable expectation that the advances made would be repaid.

As of June 30, 1958, the end of its first year of operation, Harriston Lumber had generated enough cash (despite an $18,319 loss) to repay the amounts advanced by petitioner. The open account showed a *credit* balance of $13,948.24 at this date. For fiscal 1959, petitioner made net advances of some $60,000, resulting in a June 30, 1959 debit balance in the open account of $45,872.72. During this year, however, Harriston Lumber had managed to cut its losses to $9,446, showing a slight increase in sales and building up its inventories by approximately 25 percent. In light of these facts, and keeping in mind that we ought not, in the absence of compelling reasons, substitute our business judgment for that of the taxpayer, it was not unrealistic for petitioner to expect repayment and to continue its credit arrangement with Harriston Lumber.

Fiscal 1960, however, marked a critical turning point in the financial condition of Harriston Lumber and its prospects for future success. The company reported a loss of $34,507 on approximately 14-percent lower sales. As of June 30, 1960, the balance in the open account had increased $82,695.03, from $45,872.72 to $128,567.75. Inventories had been built up by about $70,000, but at yearend the industry was still in relatively poor shape and there is little, if anything, in the record to indicate that there were reasonable prospects that this inventory could be disposed of in the context of profitable operation of the business as a whole. Concededly, if such reasonable prospects had been shown to exist, it would be inappropriate to use the hindsight of post-fiscal-1960 events. But, absent evidence upon which to base an evaluation of such prospects, we think it of some significance that fiscal 1961 produced a still lower level of sales and a loss almost double that of fiscal 1960 on the part of Harriston Lumber.

We think that, no later than the end of fiscal 1960, petitioner should have seen the writing on the wall and recognized the abyss into which its funds were falling. The only evidence to the contrary is some general self-serving testimony of petitioner's witnesses, but this testimony at best shows that petitioner had only an ephemeral hope of recovering any advances made after that date.[6] There is not the slight-

---

[6] If the turning point actually came at a later date, petitioner has failed in its burden of so proving. Petitioner on brief suggests that the financial position of Harriston Lumber would have a rosier hue if we were to consider the obligation of $108,100 to the foundation as equity rather than debt. But the fact is that, after fiscal 1960, the gap between the available assets of Harriston Lumber and its liabilities significantly widened and that, even if the obligation to the foundation were eliminated, Harriston Lumber was continuously in a deficit position. Moreover, the obligation to the foundation was always treated as debt by all parties, including petitioner, who acquiesced in a substantial payment on account of that obligation out of the proceeds of the liquidation of Harriston Lumber.

est indication that Harriston Lumber ever made any attempt to alleviate its crippled condition. It started out, and continued to operate, with outdated equipment, often forfeiting potential sales because it lacked dry-kiln facilities. Only 3 miles away, another Gooch mill—dependent on the same timber supply as Harriston Lumber and also heavily bankrolled by petitioner—struggled to continue operations with relatively little success. It was pure fantasy to think that both mills could survive under such conditions. Despite the fact that Harriston Lumber may have been plagued by poor local management, we cannot believe that, in view of the factors noted above, the panacea lay simply in finding the right person to run the show.

Nor can we conceive that a source unrelated to the Gooch enterprises would have been willing to extend similar credit tolerance to Harriston Lumber, at least after June 30, 1960. Concededly, this factor alone will not necessarily preclude the finding of a bona fide indebtedness. Cf. *Jack Daniel Distillery*, 379 F. 2d 569 (Ct.Cl. 1967). Moreover, we recognize that different creditors invariably undertake different degrees of risk and that, where debtor and creditor are related, the lender might understandably offer more lenient terms than could be secured elsewhere. Yet, in view of the situation at June 30, 1960, we are hard put to fathom *any* outside party considering extending credit to Harriston Lumber *on any terms*, let alone on those so graciously bestowed by petitioner. Cf. *Motel Co.* v. *Commissioner*, 340 F. 2d 445, 446 (C.A. 2, 1965), affirming a Memorandum Opinion of this Court; *Erard A. Matthiessen*, 16 T.C. 781, 786 (1951), affd. 194 F. 2d 659 (C.A. 2, 1952).

In sum, we are satisfied that, until June 30, 1960, the advances by petitioner to Harriston Lumber constituted a bona fide indebtedness, there being at least a reasonable expectation of repayment during such period. Beyond this point, however, any expectation of repayment was, as a practical matter, nonexistent, and thus the further advances of petitioner were in the nature of contributions to capital. *United Engineers & Constructors, Inc.* v. *Smith*, an unreported case (E.D. Pa. 1959, 3 A.F.T.R. 2d 970, 59-1 U.S.T.C. par. 9322); cf. *Wilfred J. Funk, supra; Fred A. Bihlmaier*, 17 T.C. 620 (1951).[7]

Petitioner suggests the possibility that the amounts which it accrued as commissions and included in its gross income over all the years (aggregating $67,699.05) and amounts representing charges for administrative overhead, which it similarly accrued and which in effect reduced the deductions otherwise available to it (aggregating $15,999.96), should be dealt with separately. The simple fact is that

---

[7] In *Scotland Mills, Inc.*, T.C. Memo. 1965-48, we followed the same procedure in a comparable fact situation.

petitioner treated the running account with Harriston Lumber as a unit. Moreover, in every year petitioner received cash reimbursement from the proceeds of sales on behalf of Harriston Lumber in excess of amounts so charged. There is thus no reason for fragmenting the account in the manner suggested. Further, under the circumstances of this case, we perceive "no distinction between advancing money without hope of repayment and rendering a service without hope of being paid anything for it." *United Engineers & Constructors, Inc.* v. *Smith, supra.* Thus, even if we were to allocate the proceeds of sale first to the repayment of the cash advances, leaving the commissions and administrative overhead charges unpaid, it would not help petitioner. The level of expectation of repayment after June 30, 1960, was no greater with respect to the accrued but unpaid charges than it was with respect to the cash advances.[8]

Petitioner claims, in the alternative, that the entire amount of the net advances was properly deductible as either an ordinary and necessary business expense under section 162(a) or as an ordinary business loss under section 165(a). We think that the same reasoning which underpins our decision as to the bad debt issue applies in these areas. Our holding that the net advances after June 30, 1960, were in the nature of capital contributions inevitably requires the conclusion that they did not meet the "ordinary and necessary" requirement of section 162(a). *Northeastern Consolidated Co.* v. *United States, supra;* cf. *Interstate Transit Lines* v. *Commissioner,* 319 U.S. 590 (1943). We also reject the argument based on section 165(a). No amount of legerdermain can conceal the fact that any loss which petitioner sustained with respect to advances after June 30, 1960, was capital in nature. Such being the case, a holding, under the circumstances herein, that petitioner was entitled to a deduction against ordinary income for such advances would make a farce of the statutory distinction between capital and ordinary losses. *Northeastern Consolidated Co.* v. *United States, supra.*[9]

There remains the question of the measure of petitioner's allowable bad debt deduction. Theoretically, it can be argued that the proceeds of sale after June 30, 1960 should be credited against the advances prior to that date, thereby increasing the amounts considered to be in the nature of capital contributions and decreasing the amount of the bad debt deduction. But such an analysis flies in the face of

---

[8] Indeed, it would appear that, because of the extreme unlikelihood of collection, petitioner was not required to include such charges in income after that date. E.g., *Commercial Solvents Corporation,* 42 T.C. 455 (1964) (issue 2) ; see 2 Mertens, Law of Federal Income Taxation, sec. 12.75 (1967 rev. ed.).

[9] Petitioner has made no claim of a capital loss and it would appear that any such loss would have no tax effect for the years in issue.

the fact that the running account reflected an intention on the part of petitioner and Harriston to operate on a "turnover" basis by applying current proceeds of sale to current advances. In view of the foregoing, we think it proper that only the *net* advances after June 30, 1960 should be considered as in the nature of capital contributions. On that date, the debit balance in the account was $128,567.75. During the liquidation period, petitioner received a net of $71,177.24.[10] This amount should be applied against petitioner's position as a creditor, i.e., the June 30, 1960, balance. *United Engineers & Constructors, Inc.* v. *Smith, supra;* cf. *Waterman Steamship Corporation* v. *United States*, 203 F. Supp. 915, 921 (S.D. Ala. 1962), reversed on other issues 330 F. 2d 128 (C.A. 5, 1964), affd. 381 U.S. 252 (1965); *Northern Coal & Dock Co.*, 12 T.C. 42 (1949). Thus, petitioner is entitled to a bad debt deduction of $57,390.51.

To reflect prior concessions by respondent and the decision of the Court herein,

*Decision will be entered under Rule 50.*

Reviewed by the Court.

---

DRENNEN, *J.*, dissenting: I do not believe this Court is justified in determining that all advances made by petitioner to Harriston Lumber were bona fide loans up to a certain date and that all advances of a similar nature and under similar circumstances made thereafter were in the nature of capital contributions. I would consider all of petitioner's advances as loans and allow the bad debt deduction accordingly.

All of the capital stock of Harriston Lumber was owned by Foundation, not petitioner. The majority opinion recognizes that petitioner had a valid business reason for advancing funds to Harriston from July 1, 1957, up to June 30, 1960, and acknowledges that those advances were bona fide loans, even though the lumber business had had lean years prior to this time and Harriston operated at a loss throughout this period. The purpose of those advances is said to have been to assure petitioner of a supply of lumber for its activities as sales agent and to enable its principal to finance its inventory requirements and operating expenses. Petitioner protected itself with respect to those advances by collecting Harriston's sales proceeds and applying them against its "running account" with Harriston. Because of these factors the majority concludes that the advances prior to June 30, 1960, were loans.

---

[10] After the commencement of the liquidation on Jan. 31, 1962, petitioner advanced $5,000. We consider that this amount was advanced to further petitioner's interests in realizing the maximum on its advances and that consequently the petitioner was entitled to recoup this amount before applying any proceeds in reduction of the amount which we have held to represent debt.

There is nothing in the majority opinion to indicate that the reason or purpose for petitioner advancing funds to Harriston changed in June of 1960, but only that the likelihood of repayment appeared to be considerably reduced, despite the fact that petitioner still had control of Harriston's sales receipts. Nor is there anything in the opinion to indicate why petitioner would continue to throw its money away if it thought there was no likelihood of recovering it. This was a business judgment and I think the court should be very reluctant to substitute their judgment for that of management, *Malone & Hyde, Inc.*, 49 T.C. 575 (1968), particularly where the courts may not have before them all of the information available to management at the time the judgments were made.

The majority opinion, in determining that the advances were bona fide loans up to a certain point and thereafter "were in the nature of contributions to capital," relies on tests and criteria which have evolved from cases in which the issues were whether advances made to thinly capitalized corporations were loans or equity investments, and cases in which the advances were made by the principal stockholders of the recipient corporations. I seriously doubt that those criteria should be afforded much weight in a situation such as we have here where petitioner owned none of the stock of Harriston, a part of petitioner's business was derived from Harriston's operations, and there is no proof that petitioner had any ulterior tax motive in continuing to make these advances. There is no suggestion that petitioner became a stockholder of Harriston as a result of these "capital contributions" and there may be considerable doubt that petitioner was entitled to a capital loss deduction when Harriston was liquidated and dissolved.[1]

Further, even if we accept the conclusion of the majority that the advances made by petitioner after June 30, 1960, were not loans but in the nature of capital, I would apply the entire $71,177.24 of "net advances" to repay the most recent advances, thus reducing the amount of "capital contributions," rather than applying it, as the majority does, against the advances made prior to June 30, 1960, thus reducing the amount of the bad debt deduction allowed. The distinction made by the majority between the advances made prior to June 30, 1960, and the advances made after that date is purely fictitious, and I see no justification for extending the fiction even further to require that all amounts available upon liquidation of Harriston be applied against the pre-1960 "loans" rather than against the post-1960 "capital contributions," which probably made possible the recovery of the $71,177.24.

---

[1] In fn. 9 to the majority opinion there is an implication that petitioner might have been entitled to a capital loss deduction if it had had a tax effect; but the Code provision under which such a deduction might have been allowable is not mentioned.