William L. Copley and Joyce Copley v. Commissioner.
Copley v. Commissioner
Docket No. 1329-66.
United States Tax Court
T.C. Memo 1968-77; 1968 Tax Ct. Memo LEXIS 219; 27 T.C.M. (CCH) 383; T.C.M. (RIA) 68077; April 30, 1968. Filed William L. Copley, pro se, 1342 1/2 N. Hayworth St., Los Angeles, Calif. Richard L. Fishman and Erwin L. Stuller, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined a deficiency of $1,036.04 in petitioners' income tax for the taxable year 1962. The deficiency involves the single issue of whether petitioners are entitled to a business bad debt loss in the amount of $9,250.75. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners, William L. Copley and Joyce Copley, are husband and wife. They resided in Los Angeles, California, *220 at the time of the filing of the petition herein. Joyce is a party to this proceeding only by reason of having filed a joint return with William. Petitioners filed a timely joint income tax return for 1962 with the district director of internal revenue, Denver, Colorado. In May 1956, petitioners and a third party incorporated Copley and Company (hereinafter referred to as "Company") under the laws of Colorado. The Company started business in Colorado Springs, Colorado, with $4,000 of initial capital. Its principal activity was the buying and selling of securities on its own account. Occasionally it engaged in the underwriting of stocks. It was a registered broker-dealer under Section 15 of the Securities & Exchange Act of 1934. By 1962, the Company had 18 or 19 shareholders and petitioners held approximately 30 to 35 percent of its stock. 384 Because of an employee defalcation during 1962 and a great decline in the stock market, both the National Association of Securities Dealers and the Securities and Exchange Commission required the Company to close its doors until additional funds were contributed. At that time, the Company was grossly undercapitalized. It was anticipated *221 that between $100,000 and $150,000 in cash and/or securities would be needed for the Company to reinstate itself in business. To meet this requirement, the Company obtained from petitioners, members of the family, and friends approximately $180,000 in cash and/or securities under agreements substantially similar to that executed by William and set forth below. On June 22, 1962, William transferred to the Company certain securities, which were stated to have a market value of $7,114, under two agreements, each of which was entitled "Subordination Agreement" and contained the following provisions: 1. William L. Copley hereby agrees to loan to Copley and Company the securities designated in Schedule A which schedule is attached hereto and incorporated herein by reference and which securities on the date of the execution of this agreement had a market value of $ 2. William L. Copley hereby subordinates the aforementioned securities as described above in the aforementioned amounts to the claims of all present and future creditors of Copley and Company, and which subordination is effective for a period of thirteen (13) months from the date hereof. However, the subordination shall be *222 effective so long as the aforementioned securities in the account of William L. Copley, herein subordinated are held and not returned by Copley and Company but in any event for not less than thirteen (13) months from the date hereof. Said note [to be issued pursuant to this agreement] shall contain a statement that it is subject to all the provisions of this agreement, the terms of which shall be adequately referred to and incorporated by reference into said loan. This agreement is not subject to cancellation at the will of William L. Copley or of Copley and Company. 3. This agreement shall not be terminated, rescinded, or modified by mutual consent or otherwise, if the effect thereof would be to make this agreement inconsistent with the conditions of Rule 240.15C3-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, or to reduce the net capital of Copley and Company below the amount required by said rule. If this agreement is to be terminated, rescinded, or modified, or the terms and conditions hereof changed, notice shall be given to the Denver Regional Office of the Securities and Exchange *223 Commission thirty (30) days prior to the time when such change and/or modification shall be made. 4. William L. Copley hereby agrees and acknowledges that he understands that during the term of this agreement his right to demand or receive payment or a return of the securities, the subject matter of said loan, is subordinated to claims of all other creditors of Copley and Company. 5. William L. Copley hereby does loan to Copley and Company any and all of the securities on deposit as aforementioned and hereby consents that Copley and Company may utilize said securities for its sole use and purpose, and that said Copley and Company may use and deal with said securities as part of its capital and shall be subject to the risks of the business. 6. William L. Copley hereby agrees that 5% interest per annum payable quarterly shall be paid by Copley and Company on account of its obligation herein to William L. Copley, and in the event Copley and Company defaults in the performance of any covenants or conditions required on its part to be performed, William L. Copley agrees that this agreement shall nevertheless remain in full force and effect and said default shall not accelerate the *224 maturity of the indebtedness. 7. This agreement shall be governed by the laws of the State of Colorado in effect at the date of its execution. The business of the Company did not improve and late in 1962 the Company went into voluntary receivership and shortly thereafter into Chapter X bankruptcy proceedings. On their 1962 return, petitioners deducted the sum of $9,250.75 as "Business Bad Debt - Copley & Co.," representing the cost of shares of stock transferred to the Company under the subordination agreements. The petitioners' basis for such shares was $9,250.75. Petitioners were not in the business of making loans, financing businesses, or promoting corporate enterprises. Ultimate Finding of Fact The transfer of shares by petitioners to the Company did not create a bona fide indebtedness. 385 Opinion The only question herein is the nature of petitioners' loss. [1] This involves the recurring and troublesome problem whether a transaction which is in form a loan should be recognized for tax purposes as giving rise to an indebtedness (as petitioners contend) or should be treated as a contribution to capital (as respondent contends). The governing Code provision *225 is section 166. [2] In the final analysis, the question depends upon the particular facts and circumstances of each case, with the taxpayer bearing the burden of proof. C.M. Gooch Lumber Sales Company, 49 T.C. 649 (Mar.) 21, 1968), and cases cited therein.
*226 The record herein is extremely skimpy. For example, we were not favored with evidence of the specifics of the Company's financial condition or business prospects in June of 1962. Similarly, although petitioner William L. Copley testified generally that the participants in the furnishing of the cash and/or securities under the subordination agreements were (with the exception of himself) nonstockholders, we were not told who they were, how many were involved, or the extent of each participant's share. In any event, in light of the facts which are contained in the record, we seriously doubt that such information would have overcome the clearly revealed elements which militate against petitioners' position. Clearly, the Company was in serious financial difficulty. Clearly, the Company was substantially deficient in respect of the net capital requirements of the Securities and Exchange Commission. [3] Concededly, petitioners were substantial shareholders of the Company. The "Subordination Agreement" strongly reflects the characteristics of an equity rather than a debt transaction, despite the references *227 therein to "loan" and "indebtedness," by virtue of the following provisions: (a) Rights were subordinated to "all present and future creditors." (b) Although an effective period of 13 months was specified, the subordination was to continue as long as the Company held the securities. (c) No termination, rescission, or modification, whether by mutual consent or otherwise, could be made if its effect was inconsistent with the net capital requirements of the Securities and Exchange Commission. (d) The Company was permitted to "utilize [the securities transferred to it] for its sole use and purpose" and "use and deal with said securities as part of its capital and * * * subject to the risks of the business." (e) No specific time of payment was stated and no default on the Company's part gave rise to any right in petitioner to accelerate maturity. We also think it of considerable significance, at least in the context of this case, that the Securities and Exchange Commission considers subordinated "liabilities" of the type involved herein as part of the "net capital" of a broker or dealer. Rules and Regulations of the Securities and Exchange Commission, 17 C.F.R. sec. 240.15c3-1(c) (2) *228 (1949 ed., 1962 supp.)
William testified that, at the time of the June 1962 transfers, he was separately indebted to the Company in the sum of $12,500. From this, he argues that the transfer of the securities could have been accomplished by paying off this loan, at least in part, and that the separate treatment of the transfers indicates that they constituted a bona fide indebtedness from the Company to him. Even if we assume for the purpose of decision that William was in fact so indebted (although he produced no corroborating evidence), it would not help petitioners. The use of the shares to make payment against the $12,500 loan would have resulted in a closed transaction for tax purposes and would have deprived William of the right to participate directly and exclusively in the possible future 386 appreciation in value in the securities transferred. The use of the subordination agreement technique could well have reflected an attempt to avoid these consequences. Peetitioners' argument, therefore, is entitled to be given little, if any, weight. We see no alternative to our finding that the transfers in June 1962 did not give rise to a bona fide indebtedness, but rather constituted *229 contributions to the capital of the Company. We should add that even if we had found that a bona fide indebtedness existed, petitioners' loss would clearly have been a nonbusiness bad debt loss, since there is no evidence to support a finding that either of petitioners was engaged in the business of making loans, financing businesses, or promoting enterprises during 1962. E.g., Whipple v. Commissioner, 373 U.S. 193 (1963); I. Hal Millsap, Jr., 46 T.C. 751 (1966), affd. 387 F. 2d 420 (C.A. 8, 1968). Decision will be entered for the respondent. Footnotes
1. The fact and measure of the loss in 1962 are not in dispute. ↩
2. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * * (d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
3. 17 C.F.R. sec. 240.15c3-1 (1949 ed., 1962 supp.)↩.