VIRGIL H. STEURY and ADA STEURY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Steury v. Commissioner
Docket No. 14533-83.
United States Tax Court
T.C. Memo 1985-416; 1985 Tax Ct. Memo LEXIS 210; 50 T.C.M. (CCH) 744; T.C.M. (RIA) 85416; August 13, 1985. Michael E. Armey and Robert L. Rasor, for the petitioners. Elsie Hall, for the respondent. JACOBS
JACOBS, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1976, 1977, 1978 and 1979 as follows: Taxable Year
Deficiency
1976
$68,841
1977
61,974
1978
8.109
1979
17,337
The issue for decision is whether petitioners may claim a deduction for a bad debt in 1979 [1] for advances made *211 by Virgil H. Steury to a corporation which he controlled. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time of the filing of their petition, petitioners Virgil H. Steury and his wife, Ada Steury, resided in Goshen, Indiana.Ada is a party to this proceeding only by virtue of having filed a joint return with Virgil; accordingly, Virgil singularly hereinafter sometimes will be referred to as petitioner. Virgil was a self-made man, having no formal education beyond the eighth grade. He and his brother, Edwin, founded Steury Corporation, a corporation duly organized under the laws of Indiana in October, 1957. Steury Corporation was engaged in the manufacture and sale of boats and campers in Goshen, Indiana, until it ceased business operations on August 14, 1979. Steury Corporation and issued and outstanding 1,058.000 *212 shares of common stock (900,000 shares of which were owned by Virgil and 158,000 shares of which were owned by Edwin); its stated capital was $32,000. Virgil was the president and treasurer of Steury Corporation; Edwin was the vice-president, in charge of personnel. Steury Corporation grew rapidly during the late 1950's and early 1960's. It contributed considerably to the economy of Goshen, eventually employing 150 persons with an annual payroll of over $1,000,000. [2]
*213 As a result of Steury Corporation's being unable to find a supplier for the upholstered seating used in the boats it manufactured, Virgil and Ada formed Veada Industries, Inc. (Veada). All the stock of Veada was owned by Virgil and his two sons. The growth of Veada paralleled Steury Corporation and for approximately 15 years it had no other customers. Its annual gross sales exceeded $1,500,000, and it employed between 40 and 60 persons. In addition to manufacturing boat seatings, Veada manufactured interiors for boats and canvas for pop-up campers. Steury Brothers is an Indiana Partnership consisting of Virgil and Edwin. The partnership owned several buildings, all of which were leased to Steury Corporation. There were no written leases between Steury Brothers and Steury Corporation; rather the corporation paid monthly rent to the partnership pursuant to an informal understanding. Because of the oil crisis in the early 1970's, Steury Corporation, like others in the recreational industry, began to experience a decline in sales while its costs increased. Its profits (and losses) and net worth (per books) for its fiscal years ended July 31, 1973 through July 31, 1978, inclusive, *214 were as follows: Fiscal Years
Net Profits
Net Worth
Ended July 31
(Net Losses)
per Books
1973
$42,932.54 $777,132.46 1974
(348,156.73)
444,054.13 1975
(29,794.81)
414,259.32 1976
81,080.88 496,042.55 1977
(152,876.51)
352,089.00 1978
(676,330.75)
(379,374.76)
On July 29, 1977, Steury Corporation borrowed, on a revolving term basis, $1,200,000 from St. Joseph Valley Bank of Elkhart, Indiana. The loan was evidenced by a secured note, payable on demand, with interest fluctuating between 1 and 1-1/2 percent above prime, depending on the amount of the outstanding principle balance. Pursuant to that Term Loan Agreement with the St. Joseph Valley Bank, Steury Corporation agreed, among other things, to maintain a net worth of not less than $350,000 and to have at all times a working capital of $100,000 or more. By July 31, 1978, Steury Corporation was not in compliance with the provisions of the St. Joseph Valley Bank Term Loan Agreement. As a result of suffering an operating loss of $676,330.75 for the fiscal year ended July 31, 1978, Steury Corporation had a deficit in net worth (as reflected on its books) of $379,374.76. [3] *215 Although St. Joseph Valley Bank was aware of the default, it did not call the loan. In order to bolster Steury Corporation's cash position, and to provide it with funds to sustain operations, petitioner personally obtained a line of credit of $500,000 from Salem Bank and Trust Company (Salem Bank) of Goshen, Indiana, for the purpose of channeling funds to Steury Corporation. On August 4, 1978, petitioner signed a demand note for the full $500,000, with interest at the rate of 1 percent above prime. As security for his loan with Salem Bank, petitioner mortgaged two tracts of land which he personally owned, and assigned certain lease rentals to Salem Bank. Between August 4, 1978 and October 13, 1978, petitioner took down $440,000 of his $500,000 *216 line of credit with Salem Bank, as follows: Date
Amount Advanced By Bank
August 4, 1978
$150,000
September 1, 1978
100,000
September 28, 1978
100,000
October 13, 1978
90,000
$440,000
After borrowing the aforesaid funds from Salem Bank, petitioner made the following advances to Steury Corporation: Date of Advance
Balance on
Per Books of
Repayment by
Interest paid
Steury Corp's.
Steury Corp.
Amount
Steury Corp.
by Steury Corp. *
Books
July 31, 1978 [4]
$130,000
$130,000
Aug. 29, 1978
20,000
150,000
Sept. 1, 1978
100,000
250,000
Sept. 28, 1978
100,000
350,000
Nov. 3, 1978
$ 6,752.11
Nov. 22, 1978
16,000
366,000
Dec. 8, 1978
34,000
400,000
Dec. 12, 1978
$50,000
350,000
Dec. 21, 1978
15,000
365,000
Dec. 22, 1978
22,000
387,000
Jan. 15, 1979
10,000
377,000
Feb. 7, 1979
10,062.52
May 4, 1979
12,650.02
May 18, 1979
27,000
350,000
Aug. 2, 1979
4,754.31
TOTAL
$437,000
$87,000
$34,218.96
*217 At the time petitioner made the aforementioned advances to Steury Corporation, no notes for the advances had been executed, no specific credit terms had been agreed upon, and no security had been given for the advances. Further, there were no formal arrangements for the repayment of the advances, although repayment of the advances, as well as payment of interest, to petitioner by Steury Corporation was geared to petitioner's payments to Salem Bank. On June 14, 1979, almost six months after the last advance, Steury Corporation gave petitioner, upon advice of counsel, a note for $350,000, evidencing the advances by petitioner. In addition, Steury Corporation gave petitioner a second mortgage on all its property. Steury Corporation did not attempt to obtain funding from a commercial source prior to its procuring funding from petitioner. Petitioner believed that Steury Corporation would have had difficulties obtaining funding from outside sources had it attempted to do so. Sometime in early 1979, petitioner decided to sell his stock in Steury Corporation. He desired to find a purchaser who would continue Steury Corporation as an ongoing, financially healthy entity, thus retaining *218 the viability of Veada's principal customer and the stability of Steury Brothers' tenant. Petitioner and his brother discussed the possible sale of their stock in Steury Corporation with Coachman Industries (Coachman), a large travel trailer and deck boat manufacturer, and with Harold Schrock (Schrock), who owned Sylvan Marine, a local manufacturer of aluminum boats. On July 27, 1979, petitioner and Edwin entered into an agreement with Schrock and Arthur Chapman (Chapman), Schrock's relative, pursuant to which Schrock and Chapman were granted an option to purchase all 1,058,000 shares of the outstanding capital stock of Steury Corporation for $100,000 plus 20 percent of the pre-tax profits of Steury Corporation for three years. In addition, the option agreement provided that the advances due petitioner by Steury would be paid down according to a prescribed repayment schedule and that the purchaser of the stock would guarantee the timely repayments of the corporate note. The option agreement was modified on August 3, 1979, to provide for a reduction in the purchase price (the amount of cash was reduced from $100,000 to $10,000) and to eliminate the purchaser's guarantee of the corporate *219 note. Upon modification of the option agreement, the option was exercised by Roper-Wright Manufacturing Co., a corporation controlled by Schrock and to which the option was assigned. Following the sale of stock, petitioner and Edwin resigned as officers, directors and employees of Steury Corporation. Eleven days following the sale, on August 14, 1979, Schrock, as president of Steury Corporation, suspended all corporate operations and caused Steury Corporation to lay off all of its employees. An involuntary petition in bankruptcy for Steury Corporation was filed on August 21, 1979, with the South Bend Division of the United States Bankruptcy Court for the Northern District of Indiana. On September 11, 1979, Nicholas Jakab (Jakab) was appointed to act as receiver, and subsequently he was appointed trustee. On September 27, 1979, Jakab filed an application to sell all the assets of Steury Corporation. As of the date such application was filed, there was pending by Coachman a written offer (which by its terms was outstanding until October 15, 1979) to purchase all the asssets of Steury Corporation for $1.4 million. Jakab recommended that the $1.4 million Coachman offer be rejected *220 since the assets had been appraised as having a market value of between $2,200,000 and $2,500,000. Additionally, on September 27, 1979, Jakab informed petitioner that he believed that second mortgage given petitioner by Steury Corporation constituted a preferential transfer which was unenforceable against the unsecured creditors of Steury Corporation and that he intended to seek a court order to set it aside as such. Petitioner's attorney agreed that the second mortgage probably could be set aside. Therefore, recognizing the futility of a contest with the receiver, and desiring to place Steury Corporation in financially healthy position as soon as possible, petitioner waived his rights to file a claim against Steury Corporation as a secured creditor for the funds advanced by him. Coachman subsequently increased its offer from $1.4 million to $1.6 million, which was acceptable to Jakab. On October 22, 1979, the sale of Steury Corporation's assets to Coachman for $1.6 million was approved by the Bankruptcy Court. On April 11, 1980, petitioner filed a proof of claim as an unsecured creditor of Steury Corporation in the amount of $358,540 for money lent to Steury Corporation, *221 plus interest. Furthermore, on April 11, 1980, Steury Brothers, through petitioner, filed (1) a proof of claim in the amount of $10,305.80 for rent under a written lease and (2) a proof of claim in the amount of $33,902 for rent pursuant to oral lease. In addition, Veada, filed two claims totaling $131,442.85. On June 6, 1980, Jakab, as trustee, filed a complaint seeking to have petitioner's advances to Steury Corporation declared to be a contribution to capital and subordinated to the claims of the unsecured creditors.Jakab further sought to have certain transfers of money from Steury Corporation to petitioner declared fraudulent and other corporate transfers to petitioenr declared preferential. In June 1981, Jakab and petitioner settled their differences and they agreed to a stipulated finding that petitioner's advances to Steury Corporation would be subordinated to the other unsecured creditors, with the understanding that petitioner would receive no payment with regard thereto "absent payment in full of all outstanding approved claims." Their agreement further provided that petitioner would repay to the trustee $4,754.31, which represented the payment of interest to petitioner *222 by Steury Corporation on August 2, 1979, and that Veada and Steury Brothers would subordinate their claims against Steury Corporation to the claims of the unsecured creditors. The agreement was approved by the bankruptcy court on August 2, 1979. The trustee's final report was filed on May 12, 1982. It reflected $467,608.38 cash on hand, after disbursements of approximately $1.2 million to St. Joseph Valley Bank and a 5 percent initial distribution to all unsecured creditors with allowed senior claims. Unpaid priority claims for taxes and administrative expenses totalled $260,174.95; thus, there was only $207,433.43 left in the bankruptcy estate to be distributed to unsecured creditors having allowed claims totalling $1,060,774.36, net of the 5 percent initial distribution. There were no funds in the bankruptcy estate to satisfy any part of the claims of petitioner, Veada or Steury Brothers. Petitioners claimed a bad debt deduction of $350,000 for Virgil's advances to Steury Corporation on Schedule C (Profit or Loss from Business or Profession) of their 1979 federal income tax return. This deduction resulted in petitioners reporting a net operating loss for 1979 which they *223 carried back to 1976, 1977 and 1978. Respondent disallowed the bad debt deduction for 1979, on the following alternative theories: (1) the advances by Virgil to Steury Corporation were capital contributions rather than loans, (2) if the advances were loans, the loans did not become worthless in 1979 and (3) if the advances were loans and if they became worthless in 1979, Steury Corporation's debt to Virgil was a nonbusiness bad debt. OPINION The threshold question involved herein is whether Virgil's advances to Steury Corporation are to be characterized as loans or capital contributions. If they are loans further inquiry must be made into whether the loans were business or nonbusiness debts and when they became worthless. Section 166(a) [5] allows a deduction for any debt which becomes worthless within the taxable year. In the case of a noncorporate taxpayer (such as an individual), if the debt is a nonsubsiness debt [6], the loss is treated as a short-term capital loss. Sectin 1.166-1(c), Income Tax Regs., provides that only a "bona fide debt" qualifies for deductibility, and that "a bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid *224 and enforceable obligation to pay a fixed or determinable sum of money." Contributions to capital are not considered a debt for purposes of section 166. Whether an advance is a "bona fide debt" or capital contribution is a factual determination which is to be made after a number of factors are considered. Among the factors which the courts have considered are: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce payment of principal and interest; (5) participation in management flowing as a result; (6) the status of the contribution in relation to regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; *225 (9) identity of interest between creditor and stockholder; (10) source of interest payments; (11) the ability of the corporation to obtain loans from outside lending institutions; (12) the extent to which the advance was used to acquire capital assets; and (13) the failure of the debtor to repay on the due date or to seek a postponement. Estate of Mixon v. United States,464 F.2d 394, 402 (5th Cir. 1972). As we stated in Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493-4 (1980): The identified factors are not equally significant, nor is any single factor determinative. Moreover, due to the myriad factual circumstances under which debt-equity questions can arise, all of the factors are not relevant to each case. The "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice. The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor *226 relationship." As expressed by this Court, the ultimate question is "Was there a genuine intention to create a debt, with reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" [Citations omitted] After careful consideration of the facts and circumstances surrounding petitioner's advances to Steury Corporation, we conclude that the advances are capital contributions rather than loans. As noted early herein, Virgil was a self-made man having but an eighth grade education. He beamed when testifying as to the early success of Steury Corporation and the importance of Steury Corporation to his hometown of Goshen. Steury Corporation was Virgil's pride and joy. In our opinion, Virgil advanced money to Steury Corporation without thought, from a legal viewpoint, as to whether such advances were debt or equity. Virgil made the advances simply because the corporation needed the cash to survive. He initially gave no thought as to specific terms for repayment of the advances or for security. It was only after Virgil consulted with an attorney did he realize the legal and tax ramifications of classifying *227 his advances as debt and it was only thereafter did he require Steury Corporation to give him a note and security. We doubt whether in July, 1978, Steury Corporation could have obtained further financing from outside sources. The fact that Steury Corporation had to look to Virgil in order to survive is singularly persuasive in our concluding that the advances were capital contributions and not loans. C.M. Gooch Lumber Sales Co. v. Commissioner,49 T.C. 649 (1968); Litton Business Systems, Inv. v. Commissioner,61 T.C. 367 (1973). Prior to the date of the first advance, Steury Corporation was insolvent. [7] It had a negative net worth, as reflected on its books, and it was in default on the St. Joseph Valley Bank loan. Steury Corporation's financial situation grew increasingly worse with each passing month and still petitioner continued to advance funds. Steury Corporation did not seek funds elsewhere. The only apparent means of obtaining financing for Steury Corporation was that utilized herein; i.e., petitioner himself borrowing money, and advancing it to Steury Corporation. We conclude that an independent commercial leader would not have loaned *228 funds to Steury Corporation under these circumstances. Furthermore, we believe petitioner intended to subordinate his rights to the other creditors of the corporation. To call the loan when Steury Corporation's fortunes waned would have resulted in the collapse of Steury Corporation. See Arlington Park Jockey Club v. Sauber,262 F.2d 902 (7th Cir. 1959); Reed v. Commissioner,242 F.2d 334 (2d Cir. 1957), affg. a Memorandum Opinion of this Court. The only possible source of repayment of the advances was from corporate earnings, as all the assets of Steury Corporation were already attached by the St. Joseph Valley Bank lien and current liabilities overwhelmed current assets. The risk that there would be no recoupment of his advances absent adequate earnings is precisely the risk assumed by an equity investor. Commissioner v. Meridian & Thirteenth Realty Co.,132 F.2d 182, 187 (7th Cir. 1942). In addition, *229 the purpose of the advances was to provide operating funds to sustain Steury Corporation's existence. The additional funding was needed not only to protect petitioner's existing investment in Steury Corporation, but his investment in Veada (Steury Corporation's supplier) and Steury Brothers (the corporation's lessor). Our conclusion is not altered by the fact that Virgil sold all his stock and severed all ties with Steury Corporation prior to the corporation's bankruptcy. We are concerned with the character of the advance at the time the advance was made; the subsequent events did not change its character. As a result of our determination that the advances were capital contributions rather than loans, we hold that petitioners are not entitled to a bad debt deduction under section 166. In view of this holding, we need not consider petitioner' additional arguments. Decision will be entered for respondent.
Footnotes
1. The deficiencies for the years 1976, 1977 and 1978 arose from the disallowance of the carryback of unused losses from 1979. The 1979 loss was generated by petitioners having claimed a bad debt deduction, which is the center of this controversy.↩
2. Virgil took personal price in Steury Corporation and in the importance of Steury Corporation to Goshen. With regard to his pride in the corporation, he stated: Well, certainly I took a personal pride in it because we started it from nothing and had built it up to that and spent our whole life at it. And, we even had our own name in the corporation and on the boats, on our product, and it was our total life. With regard to his pride in the importance of Steury Corporation to Goshen, Virgil stated: Well, it [Steury Corporation] contributed considerably to the economy [of Goshen]. I always felt it was a contributing factor to Goshen. It started in a small building and later it advanced into an area that was a marsh that you couldn't even drive through. We reclaimed it. We built nice buildings there. We employed quite a few people. We had a new street out down through there and city water and sewer. The street is even named Steury Avenue. And, it employed all these people. It had a payroll of over $1,000,000 a year and even in that last year [1979]. And, we all know what the tax implication is on something like that. And, that money was spent locally * * *↩
3. Steury Corporationhs real property had a book value which was substantially less than its market value. The book value of the real estate as of July 31, 1978 was $551,555.17, whereas the appraised value of the property was $1,702,000. Therefore, the net worth of Steury Corporation for the fiscal year ended July 31, 1978 (if calculated by valuing corporate assets at market value rather than book value) was in excess of $350,000.↩
*. In addition to the payments of interest listed above, petitioner received interest payments from Steury Corporation which were used to pay interest on his Salem Bank loan.Neither the interest income received nor the interest expense were scheduled on petitioner's Form 1040's. ↩
4. The records of Steury Corporation show a date of July 31, 1978 as the date for this advance. However, based on petitioner's testimony that the only source for these funds could have been the loan proceeds he obtained from Salem Bank, it would appear that the initial advance by petitioner to Steury Corporation was made on August 4, 1978, rather than July 31, 1978, as reflected on the books of the corporation.↩
5. All section references are to the Internal Revenue Code of 1954, as amended and in effect in 1979. ↩
6. A nonbusiness debt is defined in section 166(d)(2) as a debt other than -- (1) a debt created or acquired (as the case may be) in connection with a trade or busness of the taxpayer; or (2) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
7. Petitioners argue that Steury Corporation was not insolvent since the market value of the corporation's property greatly exceeded its book value. However, Steury Corporation lacked liquid assets to meet its debts.↩