DONALD R. CAMPBELL and PATRICIA A. CAMPBELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, RespondentCAMPBELL v. COMMISSIONERDocket No. 6066-84.United States Tax CourtT.C. Memo 1986-569; 1986 Tax Ct. Memo LEXIS 37; 52 T.C.M. (CCH) 1096; T.C.M. (RIA) 86596; November 26, 1986; Affirmed in part, Reversed in part and Remanded February 23, 1989 John P. Konvalinka and H. Wayne Grant, for the petitioners. Howard P. Levine, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the taxable year 1979 in the amount of $59,031.68 and additions to tax under sections 6651(a)(1)1 and 6653(a) in the respective amounts of $2,951.58 and $4,045.92. Some of the issues have been disposed of by agreement of the parties, leaving for our decision the following: (1) Whether petitioners are entitled to deduct the losses shown on their return from their claimed participation in a partnership, Health Air. (2) Whether petitioners are entitled to the claimed investment tax credit on an airplane purchased by Health Air. (3) Whether amounts advanced to petitioner, Donald R. Campbell, by Area Psychological Clinic, P.C., in 1979 are loans or compensation*40 for services. (4) Whether petitioners are liable for the additions to tax provided for in sections 6651(a)(1) and 6653(a). FINDINGS OF FACTS Some of the facts have been stipulated and are found accordingly. Donald R. Campbell (petitioner) and Patricia A. Campbell, husband and wife, who resided in Walden, Tennessee, at the time of the filing of their petition in this case, filed a joint Federal income tax return for the calendar year 1979 with the Memphis Service Center, Memphis, Tennessee, on June 29, 1980.Petitioners had previously been granted an extension of time in which to file their 1979 return to June 15, 1980 (Sunday). The postmark date on the envelope in which petitioners mailed their 1979 income tax return was June 26, 1980. On June 27, 1979, a general partnership, Health Air, was formed under the laws of North Carolina. Although formed under the laws of North Carolina, the partnership was governed by the laws of Tennessee. The following*41 schedule shows the partners of Health Air partnership and their respective percentage of ownership: PartnersPercentage of OwnershipBobby G. Rouse16.5Jerry E. Gilliland16.5Donald R. Abercrombie16.5Robert T. Spalding16.5Donald R. Campbell16.5William K. Dwyer16.5Health Air, Inc.1.0100.0 Health Care Corporation (HCC) is a Tennessee corporation chartered on March 29, 1979. The following schedule shows the original shareholders and capitalization of HCC: No. ofCert. No.ShareholderSharesConsideration *1Bobby G. Rouse380$ 20,000  2Jerry E. Gilliland38020,0003Donald R. Abercrombie38020,0004Robert T. Spalding38020,0005Donald R. Campbell38020,0006William K. Dwyer10040,000Total2,000$140,000  HCC was formed to invest in and develop health care facilities, primarily in the psychiatric area. On July 8, 1981, HCC filed a Form S-1 with the Securities and Exchange Commission in Washington, D.C. On December 10, 1981, HCC merged with Hospital Corporation of America (HCA). HCC*42 survived as an entity and became a wholly owned subsidiary of HCA, the name of which was subsequently changed to HCA Psychiatric Company. On or about June 28, 1979, Health Air partnership purchased its only asset, a 1979 Beechcraft airplane, Model No. King Air C-90, from Hangar One, Inc. On June 27, 1979, the partners of Health Air partnership, individually and d/b/a Health Air, executed Aircraft Security Agreement Documents with the Commercial Credit Equipment Corporation (CCEC). The partners of Health Air partnership were personally liable on a full recourse promissory note to CCEC in the amount of $641,717. The purchase price of the airplane was $710,315.78. A cash downpayment in the amount of $68,615.78 left an unpaid balance on the purchase price of the airplane of $641,700. Title and recording fees in the amount of $17 brought the principal balance of the note to CCEC to $641,717. A finance charge in the amount of $428,140.12 was added to the amount of the note resulting in a total balance owed by Health Air partnership to CCEC of $1,069,857.12. The security agreement provided for 83 equal monthly installments of $9,680.68 due on the 10th day of each month commencing*43 in August 1979. A balloon payment in the amount of $266,360.68 was due on July 10, 1986. HCC was a guarantor on the Health Air partnership full recourse promissory note for the purchase of the airplane. HCC advanced Health Air partnership $60,000 towards the downpayment on the purchase price of the airplane. Health Air partnership accounted for the advance for the downpayment on the airplane as a credit "due to/from affiliate -- HCC" account. Although the partners of Health Air partnership executed the documents for the purchase of the airplane in Chattanooga, Tennessee, the Beechcraft airplane was registered in North Carolina, so no sales tax was paid on its purchase. Except for registering the airplane in North Carolina Health Air partnership had no activities in North Carolina. One reason for the acquisition of the airplane by Health Air partnership was to provide transportation to HCC's officers and employees. In 1978, airline service to Chattanooga, Tennessee, was curtailed by the major airlines, thus creating substantial transportation problems for local residents. For this reason HCC needed an airplane in the operation of its business. On June 23, 1981, an option agreement*44 was entered into between Health Air partnership and HCC wherein HCC was granted an option to pourchase the airplane when Health Air partnership notified HCC that it intended to sell the plane.Pursuant to the option, the purchase price of the airplane was to equal one-half of the amount by which the fair market value of the airplane at that time exceeded the sum of the outstanding purchase money indebtedness and the net amount of any advances made by HCC to Health Air partnership. This option was never exercised. On June 27, 1979, Health Air partnership entered into an agreement to lease the Beechcraft airplane to HCC until June 30, 1982. Bobby G. Rouse, Ph.D., a psychologist, was managing general partner of Health Air partnership as well as president, chief executive officer and chairman of the board of directors of HCC. The equipment lease between HCC and Health Air partnership was executed by Dr. Rouse both as a general partner of Health Air partnership and as president of HCC. HCC, the lessee, was obligated under the equipment lease to pay Health Air partnership, the lessor, $11,000 per month as rent for the lease of the Beechcraft airplane. HCC was expressly obligated under*45 the equipment lease to pay for repairs, insurance, taxes and maintenance on the airplane at its own cost and expense. There was no additional oral or written lease between Health Air partnership and HCC. The equipment lease could not be amended, altered or changed except by a written agreement signed by both parties. The term of the lease as well as the rental charges were blank when the equipment lease was initially executed by Dr. Rouse. At a later date the lease term and rental charge were inserted in the equipment lease by Dr. Rouse. These insertions showed the lease term to end on June 30, 1982 and the rental charge to be $11,000 per month. On June 27, 1979, Health Air partnership, lessor, entered into an Aircraft Operating Charter Agreement with Hangar One, Inc., lessee, for the Beechcraft airplane. On August 28, 1979, the parties executed an amendment to this agreement. For the period from July 1, 1979 through June 30, 1980, Hangar One agreed to poay Health Air partnership for a minimum of 240 hours of flight utilization or 60 hours per quarter regardless of its actual use of the airplane. The 240 hours was referred to as an "Annual Minimum Guaranteed Time." If at the*46 end of any quarter during the first year of operation, Hanger One failed to use the airplane at least 60 hours, Hangar One was to pay to Health Air partnership $120 for each unused hour. The unused hours were computed from the difference between the cumulative number of hours actually flown by Hangar One or credited to Hangar One during the quarter and 60 hours. Pursuant to the terms of the charter agreement, Health Air partnership had the exclusive use of the airplane unless Hangar One gave Health Air partnership "Forty-eight (48) hours advance notice * * * provided that said Aircraft has not been previously scheduled for use by the Lessor during any of the time of the Lessee's proposed use." If Hangar One could not utilize the airplane due to Health Air partnership's use of the airplane, the guaranteed minimum utilization was proportionately reduced by the number of hours that Hangar One would have used the airplane. HCC had the right of first refusal on the day-to-day use of the airplane. The charter agreement provided that Hanger One pay as a charter fee to Health Air partnership 70 percent of the flight revenues produced by the airplane as determined by invoices rendered to*47 Hangar One's customers. Flight revenue was calculated on a statute mile basis for revenue producing flights with the understanding that the rate was at the prevailing rate (not less than $1.45 per statute mile, excluding expenses incurred by the customer for lessee's pilot). Hangar One used the airplane a total of 9.5 hours from the period July 1, 1979 through December 31, 1979, as detailed below: Month and YearDateHoursJuly, 19797-08-793.37-21-793.4Total July6.7August, 19790September, 19799-20-791.3Total September1.3October, 19790November, 19790December, 197912-06-791.5Total December1.5Total July 1, 1979 -December 31, 19799.5Hangar One's guaranteed minimum flight utilization was reduced 202.8 hours because of prior commitment by Health Air partnership for use of the airplane from July 1, 1979 through December 31, 1979, as detailed below: Month and YearDateHoursJuly, 197907-11-792.007-18-792.507-24-795.007-26-795.007-28-794.0Total July18.50August, 197908-03-792.508-07-796.008-08-793.508-09-793.508-10-793.508-13-793.0Maintenance -08-22-79 thru08-31-796.6Unaccounted4.5Total August33.10September, 197909-04-793.009-04-793.509-05-793.509-06-793.009-07-792.509-11-795.009-13-794.509-14-797.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-21-794.009-27-794.509-28-793.0Total September, 197943.50October, 197910-02-792.510-03-794.010-05-798.010-18-796.010-25-795.510-29-792.210-30-798.0Total October36.20November, 197911-08-796.511-12/11-14-798.011-15-793.511-20-797.011-29-795.011-30-793.5Total November33.50December, 197912-04-793.012-06-798.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.5Maintenance -12-11/12-15-793.312-18-795.012-22-793.012-28-793.2Total December38.00Total July 1, 1979 -December 31, 1979202.80*48 Health Air partnership reported gross receipts in the amount of $95,325.89 on the cash method of accounting in its 6 months of operation in 1979. Total income earned by Health Air partnership from Hangar One in 1979 was $1,951.81. The airplane was leased 340.2 hours in 1979. Golden Gallon leased the airplane 7.4 hours from Health Air partnership in 1979. Health Air partnership leased the airplane a maximum of 15.7 hours to other unrelated parties in 1979. Area Psychological Clinic leased the airplane 26.7 hours from Health Air partnership in 1979. Valley Psychiatric Hospital Corporation leased the airplane 17.1 hours from Health Air partnership in 1979. Medical Park Hospital leased the airplane 2.1 hours from Health Air partnership in 1979. HCC leased the airplane 263 hours from Health Air partnership in 1979. The airplane was leased by HCC 77 percent of the time of its total use in 1979. The airplane was leased by HCC or other related parties 91 percent of the time of its total use in 1979. Health Air partnership stored the airplane at Hangar One and maintenance on the airplane was performed by Hangar One and the cost thereof charged to Health Air. HCC made monthly*49 payments of $9,680.68 on the promissory note Health Air partnership signed for the purchase of the airplane for the last 5 months of 1979 for total payments in 1979 of $48,403.40. The rental income Health Air partnership received from HCC was reclassified and offset against the note payments made by HCC for the last 5 months of 1979. HCC also paid all expenses for the operation of the airplane. No books and records were maintained by Health Air partnership in a central office because the partnership had no official place of business. The accounting records were prepared by HCC personnel based on information supplied from the "clearing accounts" maintained at Hangar One. Health Air partnership employed no outside personnel to maintain their "accounting system." Health Air partnership's expenses were paid by: (1) monthly payments on the promissory notes were advanced by HCC to the checking account of Health Air partnership; (2) some operating expenses were offset against Hangar One's rental payments; and (3) some operating expenses were offset against HCC's rental payments. Health Air partnership reported losses for the years 1979 through 1983 as follows: 1979$77,730.771980234,043.091981227,581.07198270,006.621983124,697.57*50 These losses were distributed as follows: Partner19791980198119821983Rouse($12,825.58)($38,617.11)($37,550.88)($11,551.09)($20,575.10)Gilliland($12,825.58)($38,617.11)($37,550.88)($11,551.09)($20,575.10)Abercrombie($12,825.58)($38,617.11)($37,550.88)($11,551.09)($20,575.10)Spalding($12,825.58)($38,617.11)($37,550.88)($11,551.09)($20,575.10)Campbell($12,825.58)($38,617.11)($37,550.88)($11,551.09)($20,575.10)Dwyer($12,825.58)($38,617.11)($37,550.88)($11,551.09)($20,575.10)HealthAir, Inc.($ 777.31)($ 2,340.43)($ 2,275.79)($ 700.08)($ 1,246.97)($77,730.79)($234,043.09)($227,581.07)($70,006.62)($124,697.57)In 1979, Health Air partnership claimed an investment tax credit on the purchase of the Beechcraft airplane using a basis of $872,276 which was distributed as follows: PartnerBasisITCRouse$143,925.54$14,392.55Gilliland143,925.5414,392.55Abercrombie143,925.5414,392.55Spalding143,925.5414,392.55Campbell143,925.5414,392.55Health Air, Inc.8,722.76872.30$872,276.00$87,227.60No*51 partner of Health Air partnership contributed capital to the partnership during the years 1979, 1980 or 1981. Health Air, Inc., is a North Carolina corporation which was incorporated on June 28, 1979, for the express purpose of buying or otherwise acquiring, owning, holding, exchanging and leasing, as well as operating, aircraft as a private or contract carrier. Health Air, Inc., was a one percent partner in Health Air partnership. Dr. Rouse was the president of Health Air, Inc., from its inception until he resigned some time in 1983. Health Air partnership did not advertise the availability of the airplane; however, Hangar One made attempts to market the plane. After December 10, 1981, when HCC merged with HCA, HCA paid Health Air partnership $11,000 per month for rental of the Beechcraft airplane. HCA ceased to lease the airplane from Health Air partnership when the equipment lease expired on June 30, 1982. As of December 31, 1979, in addition to the six original incorporator-shareholders of HCC, an additional shareholder, Dr. Nat T. Winston, purchased 101,091 shares of common stock of HCC for $14,000. In June 1981, HCC canceled the 101,091 shares of HCC's common stock issued*52 to Dr. Winston for $14,000 paid by HCC forgiving obligations owed it by Dr. Winston.Beginning in January 1980, Dr. Winston was executive vice president in charge of professional relations and was a director on the board of directors of HCC. In December 1979, HCC issued 21,416 shares of common stock to each Drs. Rouse, Gilliland, Spalding and Campbell (petitioner) and Mr. Abercrombie, CPA, for their combined 97 percent interest in Valley Psychiatric Hospital Corporation. As of December 31, 1980, the two additional shareholders in Valley Psychiatric Hospital Corporation were Drs. Henry C. Evans and David V. MacNaughton. In December 1980, Drs. Evans and MacNaughton exchanged their interest in Valley Psychiatric Hospital Corporation for 2,000 shares each of HCC's class A preferred stock at $5 par value. Valley Psychiatric Hospital Corporation became a wholly owned subsidiary of HCC. As of June 30, 1981, the following shareholders had the following interests in HCC: NumberPercentageShareholderof Sharesof OwnershipRouse695,23732.7Gilliland696,63732.9Abercrombie330,85415.6As of June 30, 1981, Drs. Rouse and Gilliland and Mr. Abercrombie*53 collectively owned 1,722,728 shares or 81.2 percent of the common stock of HCC, and all officers and directors as a group (six persons) owned 2,069,655 shares or 97.6 percent. Dr. Gilliland was executive vice president -- development, secretary, and on the board of directors of HCC. Mr. Abercrombie was executive vice president -- finance, treasurer and on the board of directors of HCC. Dr. Rouse, Dr. Gilliland and Mr. Abercrombie were the only three members of the executive committee of HCC. Petitioner did not discuss any aspects of buying and leasing an airplane with the other partners of Health Air partnership. Petitioner was not involved in the management of Health Air partnership but relied on Dr. Rouse, Dr. Gilliland and Mr. Abercrombie to manage the partnership. The consent of a majority of the percentage ownership of the Health Air partnership partners was required with respect to the management, conduct and operation of the business of the partnership. Without the written consent of all partners of Health Air partnership, no partner could pay or incur any obligation or expense in excess of $2,000, or make, execute or deliver a security agreement. The management of HCC*54 was identical to the management of Health Air partnership. On December 10, 1981, an escrow agreement was entered into between HCC, HCA, shareholders of HCC and the escrow agent, Third National Bank in Nashville. Pursuant to the escrow agreement, HCC's financial records were to be audited by December 10, 1981, by Arthur Young and Company. The purpose of the escrow agreement was to provide security for HCA for certain contingency obligations under the agreement entered into on September 16, 1981, between HCA and HCC which provided for the merger of HCA and HCC. Pursuant to the escrow agreement, the HCC shareholders agreed to indemnify and hold HCA harmless from and against any and all expenses or obligations incurred by HCA because of discrepancies in the actual value of HCC and the value shown by its records. The closing audit reflected directly all of the amounts of the contingent liability incurred by HCC shareholders when HCC merged with HCA. As of December 31, 1981, the outstanding accounts receivable due HCC from advances to affiliates totaled $387,607.42. The outstanding accounts receivable due HCC from Health Air partnership for advances to affiliates was $371,377.35. *55 An adjustment was made to HCC's December 31, 1981, pre-closing trial balance to write off the $371,377.35 outstanding accounts receivable due HCC from Health Air partnership. The $371,377.35 of outstanding accounts receivable due HCC from Health Air partnership which were written off was carried over to HCC's working trial balance and consolidating balance sheet for the year ending December 31, 1981. This amount was later reinstated as an amount due HCC from Health Air partnership. An accounts receivable due HCC from Health Air partnership in the amount of $93,462 was written off the books and records of HCC on December 31, 1979. On October 21, 1982, an employment agreement was entered into between Mr. Abercrombie and HCA. As a condition procedent to the agreement, Mr. Abercrombie agreed to execute a promissory note to HCA representing 16.5 percent of the amount owed HCA by Health Air partnership. On October 1, 1982, Mr. Abercrombie and Dr. Rouse signed promissory notes and agreed to pay HCA $61,277.05. This represents 16.5 percent of the amount owed HCC by Health Air partnership. The payments were to be made as follows: $10,212.84 was due on October 1, 1983; $20,425.68 was*56 due on October 1, 1985; and $30,638.53 was due on October 1, 1986. On October 21, 1982, a similar agreement and promissory note were signed by Dr. Gilliland and HCA. On September 27, 1982, an aircraft operating lease lasting one year was entered into between Health Air partnership and Stevens Beechcraft, Inc.Health Air partnership sold the airplane to Career Aviation Sales, Inc. on March 22, 1984, for $414,000. Area Psychological Clinic, Inc. (APC), was a Tennessee corporation chartered on October 17, 1974. Dr. Rouse and Dr. Gilliland, the only two shareholders in APC each owned 50 percent of the common stock. Petitioner was employed by APC from 1975 until on or about October 30, 1980, and was a member of the board of directors of APC in 1977 and 1978. Petitioner was elected chairman of the board of directors of APC on January 18, 1979. Between 1975 and 1980, petitioner was a practicing child and adult psychiatrist. APC maintained an open-ended drawing account for petitioner. The clinic expended $32,580.78 on behalf of petitioner in 1979 for personal expenses. These amounts were not included as income in petitioner's income tax return for 1979. Of the $32,580.78 expended*57 by APC on behalf of petitioner during 1979, $24,546.92 was not deducted by APC but was reflected as "other loans" on APC's corporate income tax return for its fiscal year ending October 31, 1979. No contemporaneous notes for the personal expenses paid by APC for petitioner in 1979 were executed. The clinic's general ledger trial balance for the period October 1, 1980 to October 31, 1980, reflected a balance due from petitioner of $42,919.49. The clinic's general ledger trial balance for the period December 1, 1980 to December 31, 1980, reflected a balance due from petitioner in the amount of $48,571.38. To prevent petitioner from being available to competitors and in order to retain petitioner's services, on October 30, 1980, an agreement was entered into between petitioner, as consultant, and APC. On October 31, 1980, petitioner executed a promissory note to APC in the amount of $43,551.59. The note stated that it was in exchange "for value received." The value received in exchange for the promise to pay was not enumerated on the note. Pursuant to the terms of the note, petitioner was required to make 48 monthly installment payments of $907.32 commencing on January 1, 1982, and*58 for every consecutive month thereafter. Petitioner made no payment on the note or any other note to APC in January or February of 1982. Petitioner made no payments on the note or any other note to APC from April 1982 until November 1982. In an updated letter from the controller at Valley Hospital, petitioner was advised that a balance of $37,679.74 remained on his note to APC. Petitioner was advised that this was comprised of the original balance of $48,571.38 less payment in March 1982 of $1,814.64 and in November 1982 of $9,077. On October 30, 1982, a check drawn on the joint account of Donald R. or Patricia A. Campbell in the amount of $9,077 was written to APC. From October 15, 1982 until April 19, 1984, petitioner was involved in a legal dispute with APC, HCC and HCA. On his Federal income tax return for taxable year 1979, petitioner claimed an ordinary partnership loss in the amount of $12,825.58 as a result of being a partner in Health Air partnership. This represented petitioner's 16.5 percent ownership in Health Air partnership. On the Schedule K-1 filed by Health Air partnership for taxable year 1979, the partnership reported gross receipts in the amount of $95,325.89. *59 The following deductions were claimed: Interest$ 18,509.71Depreciation95,763.31Amortization of carryingcharges over 83 months12,044.15Other DeductionsAirplane fuel$28,195.51Airplane supplies1,366.13Airplane landing fees296.18Airplane maintenance7,721.55Airplane insurance8,860.12Miscellaneous300.00Total Other Deductions46,739.49Total Deductions$173,056.66Ordinary Loss$ 77,730.77Respondent, in his notice of deficiency, disallowed the partnership loss claimed by petitioner with the explanation that it had not been established "that expenditures were for ordinary and necessary business expense, or were expended for the purpose designated." Respondent also increased petitioner's taxable income by the amount of $45,990.01 with the following explanation: During the taxable year ended December 31, 1979, the Area Psychological Clinic, P.C., made payments to you or for your benefit and permitted you to use corporate property without compensation. Such items are dividend income under Sections 301 and 316 of the Internal Revenue Code and are includable in your gross income*60 in the following amounts: 12-31-79Drawing account$ 4,515.26Auto's received, FMV26,989.20Auto use (operating expense)12,789.39Miscellaneous: Fowler Bros. Furniture$295.16DeWayne B. McCamish, D.D.S.395.00Commerce Union Bank - 1979 GMC402.93A. Fassnacht603.07Total miscellaneous1,696.16Total dividend income$45,990.01Therefore, your taxable income is increased $45,990.01 for the taxable year ended December 31, 1979. In his notice of deficiency respondent also disallowed $14,591.76 of petitioner's claim of an investment tax credit wit the following explanation: AssetsPurchase PriceHealth Air partnership airplane$143,925.54Area Group Investment Co. Assets1,301.60Computer Data Service690.43Total Assets$145,917.57Investment Tax Credit Rate10%Total Credit Disallowed$ 14,591.76Total Credit Per Return14,604.56Investment Credit Allowable$ 12.80In his notice of deficiency respondent determined additions to tax for petitioners' failure to timely file their return and for negligence with the following explanation: Since your income tax return[s] [sic] for the tax year*61 1979 was not filed within the time prescribed by law and you have not shown that the failure to file on time was due to reasonable cause, five (5%) percent of the tax is added as provided by Section 6651(a) of the Internal Revenue Code. Part of the underpayment of tax for the tax year ended December 31, 1979 is due to negligence or intentional disregard of rules and regulations. Consequently, the 5 percent addition to the tax is charged for that year, as provided by Section 6653(a) of the Internal Revenue Code. OPINION 1. Section 183 Issue.Respondent's primary contention is that Health Air partnership was not engaged in the trade or business of leasing an airplane and therefore its activity was an activity not engaged in for profit. Section 183 disallows certain deductions attributable to an activity not engaged in for profit. 2Section 183(c) defines an "activity not engaged in for profit" as an activity other than one for which deductions are allowable under section 162 (relating to trade or business expenses) or section*62 212(1) or (212)(2) (relating to expenses for the production or collection of income, or for the management, conservation or maintenance of property held for the production of income). *63 It is well settled that for an activity to constitute the carrying on of a trade or business, such activity must be carried on for livelihood or profit or there must be a profit motive and some type of economic activity. Whether a profit is actually made is not controlling.However, the activity must be entered into in good faith with the dominant purpose and intent of realizing a profit. Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Drobny v. Commissioner,86 T.C. 1326, 1340 (1986); Flowers v. Commissioner,80 T.C. 914, 931 (1983). See also Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Whether the taxpayer possesses the required profit motive or intent is a question of fact to be decided based on all the evidence in the particular case. Section 1.183-2(b), Income Tax Regs.; Jasionowski v. Commissioner,66 T.C. 312, 319 (1976). In making this factual*64 determination, more weight must be given to the objective facts than to the mere statements of the parties. Engdahl v. Commissioner,72 T.C. 659, 666 (1979). Petitioner bears the burden of proving intent. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). "Profit" in this context means economic profit, independent of tax savings. Beck v. Commissioner,85 T.C. 557, 570 (1982); Herrick v. Commissioner,85 T.C. 237, 254-255 (1985). The regulations under section 183 set forth guidelines for determining whether a profit motive exists. Section 1.183-2(b), Income Tax Regs., provides a list of nine factors to be used in determining whether an activity is engaged in for profit. These factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisor; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer*65 in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements indicating a personal pleasure or recreation are involved. Allen v. Commissioner,72 T.C. 28, 33-34 (1979). A record of losses over the years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true intention. Section 1.183-2(b)(6), Income Tax Regs.Respondent contends that Health Air partnership was no more than a mere passive investment or financing scheme and petitioner's activities with respect to the airplane were "not engaged in for profit" within the meaning of section 183(a). Petitioner takes the view that Health Air partnership was a trade or business entered into with the good faith intent of realizing a profit through the operation of an air charter taxi service from Chattanooga, Tennessee, to other cities in the United States. Petitioner emphasizes that he intended to realize a profit on the plane's rental proceeds. *66 Petitioner also emphasizes that this particular plane was bought by the partnership because it was expected to appreciate in value. Petitioner notes that Health Air partnership realized a profit in 1984 in excess of $200,000. Citing section 1.183-2(b)(7), Income Tax Regs., petitioner argues that a substantial profit, even if only "ultimate" or "occasional" is indicative that the activity is engaged in for profit. In our view Health Air partnership was not operated in a manner consistent with established business practices. Petitioner argues that Health Air partnership was formed to own and lease an airplane; however, the airplane was leased primarily to HCC, a corporation controlled by the partners of Health Air partnership. HCC paid the downpayment on the purchase of the airplane as well as monthly note payments and all operating expenses. HCC and other related third parties were the predominant users of the airplane. Usage by unrelated third parties was insignificant. The only lease agreement entered into between HCC and Health Air partnership was disregarded by the parties. The purported charter agreement between Hangar One and Health Air partnership*67 was of little if any significance since HCC had first call on the use of the airplane. HCC leased the airplane 77 percent of the time of its total use in 1979. The airplane was leased by HCC or other related parties 91 percent of its total use in 1979. The record reflects no significant use of the plane by Hangar One or unrelated third parties. No formal books and recores were maintained by Health Air partnership. The partnership maintained only an informal accounting system which consisted of information supplied by "clearing accounts" at Hangar One. Health Air partnership had no employees and such records as were maintained of its activities were kept by employees of HCC. From the facts in this record we conclude that Health Air was formed solely as a tax avoidance vehicle for its partners who were the stockholders of HCC. Health Air leased the airplanes primarily to HCC because it had no interest in operating a leasing business for profit. Under the arrangement, HCC had use of an airplane and the Health Air partners, who were also the HCC stockholders, were intended to receive nothing from the arrangement but tax benefits without any cash outlay investment. We conclude*68 that Health Air partnership was not in the trade or business of leasing an airplane and its activity was an activity "not engaged in for profit" within the meaning of section 183. The only reason a profit was realized by Health Air partnership n 1984 was because it sold the Beechcraft airplane in that year and its claimed deductions for depreciation had been high enough that a profit arose from the sale. There is nothing in this record to support petitioners' contention that they believed the airplane would appreciate. In fact, it did depreciate. Insofar as this record shows, there was no feasible way that the airplane at any point could have been sold for an amount which would permit Health Air to recoup its prior year's losses. From 1979 through 1983, the partnership reported substantial losses and passed those losses through to its partners. As stated in the Form S-1, filed by the partnership, although "the partnership occasionally leases the airplane to third parties, the primary purpose of the acquisition of the plane was to provide transportation to the Company's [HCC] officers and employees." Clearly, this purpose is not a business purpose for the partnership. Since*69 the deductions claimed by Health Air in computing its loss which would be allowed other than as business expenses are less than Health Air's gross receipts, under section 183 Health Air is entitled to other deductions only to the extent of its gross receipts reduced by these otherwise allowable deductions. Respondent therefore correctly disallowed the entire loss claimed by petitioners from their investment in Health Air. 2. Investment Tax Credit.The second issue for our consideration is whether petitioners are entitled to a pro rata part of an investment tax credit claimed by Health Air on the purchase of the airplane. Since we have held that Health Air partnership was not in the trade or business of leasing an airplane, we conclude that no investment tax credit upon the purchase of the plane is allowable. Because of section 183(b), Health Air is entitled to allowable deductions as if it were engaged in a trade or business to the extent that its income exceeds the deductions to which it would be entitled whether or not it was in a trade or business. This does not mean that Health Air should be considered to be in a trade or business within the meaning of section 167(a)(1) *70 so as to be eligible for the investment tax credit. Furthermore, Health Air, a partnership, leased the airplane and therefore is subject to the provisions of section 46(e)(3) concerning noncorporate lessors. Petitioners have totally failed to show that deductions with respect to the airplane allowable "solely by reason of section 162" exceed 15 percent of the rental income. Deductions other than those to which Health Air is entitled whether or not in a trade or business, are allowed to Health Air by section 183(b). 3. Compensation for Services.The third issue is whether amounts advanced to Dr. Campbell (petitioner) by APC in 1979 constituted compensation for services. In his notice of deficiency, respondent determined that APC made payments to petitioner and permitted him to use corporate property without compensation to the extent of $45,990.01. Respondent determined that such items constituted dividend income to petitioner pursuant to sections 301 and 316. Respondent at the trial stated his position to be that the amounts advanced to petitioner constituted compensation for services rendered rather than dividends. This position was incorporated in an amendment to answer*71 filed pursuant to leave granted at the trial. Pursuant to Rule 142(a), it is incumbent on respondent to establish that the amounts paid by APC to or for petitioner were compensation for services. Petitioner was never a shareholder in APC and respondent obviously made an error in the notice of deficiency. The factual bases and rationale required to establish that the amounts advanced by APC constituted compensation for services, differ from those required to prove it constituted dividend income as originally determined by respondent. Since respondent's new position as raised in the amended answer requires the presentation of new evidence rather than merely clarifying or developing his original position, he has the burden of establishing that the payments were compensation to petitioners. Achiro v. Commissioner,77 T.C. 881, 890 (1981), and cases there cited. Although respondent does not concede error in the amount shown in the notice of deficiency as income to petitioners because of payments on his behalf by APC, on brief he argues only with respect to the $32,580.78 paid by APC for personal expenses of petitioner. Respondent points out that the amount of these*72 expenditures was not included by petitioner on his 1979 Federal income tax return. Respondent argues that no contemporaneous notes were given for the advances and that the evidence shows that neither party intended these payments to be loans. Respondent concludes that the amounts were intended to compensate petitioner for valuable services rendered and thus should be included in petitioner's gross income. Petitioner argues that respondent has failed to sustain his burden of proof that advances made to petitioner by APC were compensation for services rather than loans. Petitioner argues that he intended to repay the advances from APC and that he signed a promissory note for the advances and even began paying back the alleged loan.In addition, he argues that APC's conduct demonstrates its intent that the advances be repaid. Petitioner notes that APC kept an itemized record of the expense advances which were shown as receivables on APC's books and were shown as loans on APC's corporate tax returns. Whether the amounts expended by APC for petitioner are compensation for services or loans*73 is a factual question and depends on the intent of the parties at the time the funds were expended on behalf of petitioner. Fisher v. Commissioner,54 T.C. 905, 909 (1970); Haber v. Commissioner,52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1978). An essential element of a bona fide debtor/creditor relationship is a good faith intent on the part of the recipient of the funds to make repayment and a good faith intent on the part of the person advancing the funds to enforce repayment. Fisher v. Commissioner,supra at 909-910, C.M. Gooch Lumber Sales Co. v. Commissioner,49 T.C. 649, 656 (1968). The record clearly reflects that APC expended $32,580.78 for petitioner's personal expenses which included travel, furniture, home repairs, automobile payments and a boat and that these amounts were not reported as income on petitioner's 1979 Federal income tax return. The record shows that of the $32,580.78, the amount of $24,546.92 was not deducted by APC on its tax return for its fiscal year ended October 31, 1979, but was shown on the return as "other loans." The record also shows that APC*74 maintained an open-ended drawing account for petitioner. The general ledger trial balance for the period October 1, 1980 to October 31, 1980 reflected a balance due from petitioner of $42,919.59. This amount was entitled "Draw." The general ledger trial balance for the period December 1, 1980 to December 31, 1980 reflected a balance due from petitioner in the amount of $48,571.38. This account was entitled "N/R." Petitioner was not required to execute contemporaneous notes for personal expenses paid for him by APC or for any amounts of "draw" in excess of his agreed compensation. Later petitioner did execute notes for the balance shown as due and made some repayments. Based on the record as a whole, we conclude that only the $12,033.86 of payments made on petitioner's behalf in 1979 by APC, which were not treated by APC as loans, have been shown by respondent to in fact be compensation to petitioner. 4. Additions to Tax Pursuant to Section 6651(a)(1) and Section 6653(a).The final issue for our consideration is whether petitioners are liable for the additions to tax under section 6651(a)(1) for failure to file a timely return and section 6653(a) for negligence or intentional*75 disregard of rules and regulations for the year 1979. Section 6651(a)(1) imposes an addition to tax for failure to timely file a return unless the taxpayer shows that such failure was due to reasonable cause and not willful neglect. Section 6653(a) imposes an addition to tax if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations. In the instant case, petitioners filed their 1979 income tax return on June 29, 1980. The postmark date on the envelope in which petitioners mailed their return was June 26, 1980. Petitioners had been granted an extension of time in which to file their 1979 income tax return to June 15, 1980. The burden is on petitioners to prove that their failure to file their 1979 return by June 16, 1980, was due to reasonable cause rather than willful neglect. Rule 142(a). In our view, petitioners have offered no explanation suggesting that their failure to timely file their return was due to reasonable cause rather than willful*76 neglect. Petitioner contends that he was "out of town during most of the month of June." This vague statement is no adequate explanation for petitioners' failure to timely file their 1979 return. Petitioners' 1979 income tax return was not dated by petitioners or their income tax preparer. The record reflects no reasonable excuse for petitioners failure to file their return by Monday, June 16, 1980. Petitioners have thus failed to show that their failure to file the return for the year 1979 by the due date was due to reasonable cause rather than willful neglect. Section 6653(a) imposes an addition to tax if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. The burden of proof is on petitioner to establish a lack of negligence or intentional disregard of rules and regulations. Bixby v. Commissioner,58 T.C. 757, 791 (1972). Petitioner argues that the addition to tax for negligence should not be assessed in the instant case because there is a bona fide dispute as to the correctness of the deficiency. We sustain respondent's*77 determination of the section 6653(a) addition in this case. In our view an individual with petitioner's extensive education, accomplishments and intelligence must have known that the transactions involving the airplane were designed to avoid income tax. Petitioner must have known that Health Air partnership had no purpose other than to bring tax benefits to its partners. As a general partner of Health Air partnership, petitioner should have been aware of the true nature of the partnership's activities. We thus sustain respondent's determination of additions to tax pursuant to sections 6651(a)(1) and 6653(a) for the taxable year 1979. Decision will be entered under Rule 155.Footnotes1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩*. These figures are according to the stipulation of the parties.↩2. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule. -- In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩